The **UNITED STATES of America,**
Plaintiff-Appellee,

v.

**Virgil FLOYD, Defendant-Appellant.**
No. 11386.

United States Court of Appeals
Seventh Circuit.

Jan. 13, 1956.

Rehearing Denied Feb. 9, 1956.

**914**

Frank J. McAdams, Jr., Chicago, Ill., for appellant.

John B. Stoddart, Jr., U. S. Atty., Robert B. Oxtoby, Marks Alexander, John M. Daugherty, Asst. U. S. Attys., Springfield, Ill., for appellees.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

MAJOR, Circuit Judge.

Defendant, Virgil Floyd, business agent of Local 179 of the Teamsters' Union, with an office in Joliet, Illinois, was charged in a two-count indictment with a violation of Title 18 U.S.C.A. § 1951(a), known as the Hobbs Act or the Anti-Racketeering Act. Prior to trial, defendant by an appropriate motion challenged the sufficiency of the indictment and failure to allege venue in the second count. On the government's motion the second count was dismissed; otherwise, defendant's motion was overruled. A trial was had by jury, which found the defendant guilty. Judgment was entered accordingly, from which defendant appeals.

We think there is no occasion to set forth the Act upon which the indictment is predicated as that has frequently been done by other courts. See particularly Bianchi v. United States, 8 Cir., 219 F.2d 182, 186, and United States v. Varlack, 2 Cir., 225 F.2d 665, 672.

The reasons urged for a reversal are: (1) that the indictment was fatally defective because of a failure to designate the particular individual or individuals upon whom the alleged extortion was practiced; (2) that the proof failed to show beyond a reasonable doubt (a) the existence of interstate commerce within the Southern District of Illinois, which was affected or obstructed by defendant's alleged extortion, (b) the receipt of money by defendant as alleged, and (c) venue, that is, the commission of an offense against the United States within said District.

The indictment, insofar as material to its asserted deficiency, alleged that defendant "did knowingly, wilfully, unlawfully and feloniously obstruct, delay and affect 'commerce' between the several states of the United States, and the movement of the aforesaid articles, commodities, materials, supplies, pipe, ma-

chinery, and men in such 'commerce,' and did attempt so to do, by extortion, to wit: by obtaining property of the value of $2,650.00 in the form of money, from 'the contractors,' with their consent, induced by the wrongful use of actual and threatened force, violence, and fear, that is to say * * *." (There follows a detailed description of the threats which the defendant directed at "the contractors" as a means of obtaining the payment alleged to have been made.)

The indictment previously alleged in count 1:

"That hereinafter in this Indictment the term— * * *

"(e) 'the contractors' shall refer to a co-partnership composed of one J. Leroy Cox, one Martin Shay, and one Morris Stout, doing business under the style and name of J. L. Cox & Sons Pipe Stringing Corporation. * * *"

■ Defendant argues that the allegation that defendant threatened "the contractors" and that he extorted or attempted to extort money from "the contractors" is insufficient to inform him as to the person or persons to whom alleged threats were made and from whom money was sought to be extorted. Defendant cites on this point United States v. Weber, D.C., 71 F.Supp. 88; United States v. Callanan, D.C., 113 F.Supp. 766, and Larkin v. United States, 7 Cir., 107 F. 697, 701. Without analyzing these cases, we think it may be conceded that they furnish support for the contention that the indictment would be insufficient if it alleged nothing more than that threats were made to "the contractors" and that "the contractors" were the victims thereof.

However, the indictment also defined "the contractors" as a co-partnership composed of three individuals, Cox, Shay and Stout, with the firm name under which they were doing business. This allegation must be taken into consideration and when that is done we think any merit which might otherwise reside in defendant's contention disintegrates. An allegation that the defendant threatened and extorted or sought to extort money from Cox, Shay and Stout, doing business under a designated partnership name, would have been no more specific or informative to the defendant. He was charged in effect, if not specifically, with committing the alleged offense against these three named individuals, and that, in our judgment, was sufficient.

■ On the commerce issue the attack is directed at the insufficiency of the proof, not the allegations of the indictment. We think defendant's contention on this point may be disposed of by a brief statement of the facts. Sinclair Pipe Line Company of Independence, Kansas (a subsidiary of Sinclair Oil Company), was in the year 1952 engaged in the construction of an interstate pipeline extending from the state of Oklahoma, across the state of Missouri and entering the state of Illinois at a point near Quincy, Adams County, and thence easterly across said state, with its terminus at East Chicago, Indiana. Adams and other counties through which the construction was in progress are located in the Southern District of Illinois. The construction was estimated to cost more than $52,000,000. Burden Construction Company contracted to unload pipe from railroad cars and stockpile it at railroad sidings. J. L. Cox & Sons had a subcontract for stringing the pipe.

The stringing operation consisted of transporting the pipe to the pipeline right-of-way and placing it so as to be convenient for welding by the general contractor. Cox & Sons also had a contract with Sinclair to unload pipe from the railroad cars and stockpile it. The stringing operation, which is mainly involved in this controversy, was performed in a number of counties in the Southern District of Illinois. In the performance of this operation Cox & Sons transported men, material, supplies, machinery, pipe and other equipment from Oklahoma, Kansas and Missouri into Illinois, and on occasions

moved men, material and equipment from the stringing operation in Illinois to Missouri, in which state a similar operation was being performed. The purpose to be served by the pipeline was solely the transportation of crude oil between Oklahoma and East Chicago, Indiana. The line was completed and the first oil was transported through it in the early part of March, 1953. We think there is no question but that Cox & Sons, both in their unloading and stringing operations, were engaged in interstate commerce; in any event, it is certain that such operations had a direct bearing upon and affected such commerce. See Bianchi v. United States, 8 Cir., 219 F.2d 182, 190, and Hulahan v. United States, 8 Cir., 214 F.2d 441, 445.

The contention that there was a failure of proof as to venue and that the defendant received money as alleged in the indictment requires some further statement of facts. Defendant was the business agent of Local 179 of the Teamsters' Union, with an office located in Joliet, Will County, Illinois. His jurisdiction as such covered a number of counties, including Livingston and Woodford Counties in the Southern District of Illinois. Stout (one of the partners of J. L. Cox & Sons) met the defendant for the first time in the Labor Temple at Pontiac, Livingston County, Illinois, in the late spring or early summer of 1952. At that time the partnership had a contract for the unloading and was engaged in negotiation for a contract for the stringing operation.

Stout met the defendant for the purpose of securing permission to use his own drivers for the unloading operation, which was granted by the defendant. At that time defendant stated to Stout, "You go ahead with the unloading, but if you get the stringing, you come and see me before you start." After Cox & Sons had been awarded the contract for the stringing operation, Stout, after making an appointment by telephone, went to the office of the defendant in Joliet, Illinois, on August 29, 1952. Stout testified that he told defendant, "We had

the contract for stringing the pipe through Illinois and in line with our conversation in Pontiac had come in to talk to him about it," to which defendant responded, "Well, Mr. Stout, I will give you one thing to understand. Before you come in here and use your men, it's going to cost you. I have dealt with a lot of contractors. I have seen a lot of their hides on a fence and I will probably see some more." In the same conversation the defendant, according to Stout, stated, "It's going to cost you $25.00 a mile to use your regular drivers and for me not to cause you any trouble in my jurisdiction." In the same conversation defendant explained what he meant by trouble, "He would put helpers on our trucks, swampers on our trucks. In other words, cripple our payroll." Thereupon, Stout agreed to pay as requested. He and the defendant examined a map and determined that there were 106 miles within defendant's jurisdiction which, at $25.00 per mile, amounted to $2,650. Stout at that time gave defendant his personal check for $850.00, payable to cash, as a down payment.

Stout informed his partners, Cox and Shay, of his arrangement with the defendant. On November 22, 1952, prior to completion of the stringing operation, Stout, together with his partner, Shay, again met defendant in his Joliet office. Stout, in the presence of Shay, informed defendant that the job would soon be completed and that they owed him $1,-800, to which the defendant responded, "I never cashed it [the check] or deposited it because I figured it was a little risky to do it." At this time Stout offered the defendant another personal check for $1,800, which defendant refused with the statement, "I've got to have the cash." Thereupon, it was agreed that defendant should meet Stout in Kansas City, Missouri, where he would be paid $2,650 in cash. Stout and Shay returned to their homes in Raytown, Missouri, when Stout became ill and was taken to the hospital. Shay met defendant and the latter's wife in

the Union Station at Kansas City, Missouri, on November 25, 1952. Shay had his bookkeeper cash a firm check at a local bank in the amount of $2,650, went to the Union Station where he met the defendant and where an envelope was delivered to the defendant. At that time defendant returned to Shay the uncashed check which had previously been issued by Stout to defendant in Joliet, Illinois, in the amount of $850. Shay took the check to the hospital, where it was destroyed by Stout. On the same date defendant and his wife returned to their home in Joliet.

■ The argument that there was no proof that defendant received $2,650 from Shay in the Union Station in Kansas City amounts to little more than a quibble. The main point appears to be that Shay did not testify as to the contents of the envelope at the time it was delivered to the defendant. Even so, the circumstances in proof lead to the inescapable inference that it contained $2,-650 in cash and that such amount was received by defendant. Certainly the facts presented an issue for the jury.

In our view, the only serious problem presented here is that the proof was not sufficient to establish venue in the Southern District of Illinois. The government in its brief attempts to sustain venue upon two theories, (1) the first meeting between the defendant and Stout at Pontiac, Illinois, took place in the Southern District of Illinois, and (2) the fact that defendant's jurisdiction extended into two counties, namely, Livingston and Woodford, where his extortive acts obstructed, delayed and affected commerce. The trial judge at the conclusion of the argument, on a motion for a new trial stated, "The venue depends upon where, under the Acts of Congress, the commerce was being affected."

■ We are not able to discern how the fact that defendant's jurisdiction included counties within the Southern District of Illinois is any aid to the government on the issue of venue. We can see how it might bear upon the effect to be accorded the extortive threats but, even so, that does not establish the locus of the offense.

■ That the threatening statements made by defendant to Stout on August 29, 1952 were extortive within the meaning of the statute is hardly open to dispute. Hulahan v. United States, 8 Cir., 214 F.2d 441, 444; Bianchi v. United States, 8 Cir., 219 F.2d 182, 188; United States v. Varlack, 2 Cir., 225 F.2d 665, 668. Those threatening statements, however, were made in the Northern District of Illinois and the alleged payments were made within the Missouri jurisdiction.

■ As already shown, the only statement made by the defendant in the Southern District was that at Pontiac, when he said to Stout, "* * * if you get the stringing, you come and see me before you start." Undoubtedly this command or invitation referred to the stringing contract which Stout's firm at that time did not have. Defendant argues that this was an innocent statement barren of any criminal connotation. This is a plausible view when the statement is considered in isolation and irrespective of that which followed. Its purpose, however, was clearly characterized by the threats which were subsequently made at Joliet. In fact, it is reasonable to believe that defendant's statement at Pontiac was the motivating factor which caused Stout to visit defendant at Joliet where the threatening and coercive statements were made.

The statute involved refers to threats "in furtherance of a plan or purpose." The situation, therefore, gives rise to a strong inference, to which the jury had a right to subscribe, that the plan or purpose to extort had its inception in Pontiac, was carried forward at Joliet and was later consummated in Kansas City, Missouri. Under this view it would seem that the first paragraph of Title 18 U.S.C.A. § 3237, is applicable. It provides:

"* * * any offense against the United States begun in one district

and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

■■ Moreover, we agree with the theory of the trial court that venue under the statute involved may be laid in any jurisdiction where commerce is affected. We have already sustained the government's contention that commerce was obstructed, interfered with and affected within the Southern District of Illinois. While no case is called to our attention and we find none on the point, we think it plain that it was the intention and purpose of congress to authorize the laying of venue in any District wherein commerce is affected, and this irrespective both of defendant's residence and the place where the coercive threats are made. The second paragraph of Title 18 U.S.C.A. § 3237 provides in part:

"Any offense involving * * * transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce * * * moves."

■■ The question as to the applicability of this provision appears to depend upon whether the instant offense involves "transportation." We think that it does. Certainly, as previously shown, it involved the transportation of men, material and equipment from other states into the Southern District of Illinois, and vice versa. More than that, the pipeline was under construction solely for the purpose, when completed, of transporting oil in interstate commerce. Clearly an offense committed against such commerce after transportation had actually commenced would fall squarely within the statutory language lastly quoted. It is obvious that any act which impeded or delayed the construc-

tion of the pipeline likewise impeded and delayed the transportation of oil. Certainly such acts affected and, in our view, "involved" its transportation within the meaning of the statute.

The Reviser's notes to the section lastly referred to state that it was added to meet the situation created by the decision of the Supreme Court in United States v. Johnson, 323 U.S. 273, 65 S.Ct. 249, 89 L.Ed. 236. While Congress had provided no specific provision relative to venue in the Act considered by the Supreme Court in Johnson, the court recognized that Congress had the constitutional authority to do so. The court stated, 323 U.S. page 275, 65 S.Ct. at page 250:

"By utilizing the doctrine of a continuing offense, Congress may, to be sure, provide that the locality of a crime shall extend over the whole area through which force propelled by an offender operates."

Again, on the following page the court stated:

"It is significant that when Congress desires to give a choice of trial, it does so by specific venue provisions giving jurisdiction to prosecute in any criminal court of the United States through which a process of wrongdoing moves."

Thus, as the Reviser's notes state, the statute under discussion was enacted to meet Johnson, and Congress acted under the authority therein proclaimed. Rather, however, than providing for each act relating to transportation, Congress enacted a general provision which encompasses any offense involving "transportation." As is stated in the Reviser's notes:

"The revised section removes all doubt as to the venue of continuing offenses and makes unnecessary special venue provisions except in cases where Congress desires to restrict the prosecution of offenses to particular districts * * *."

In Hulahan v. United States, 8 Cir., 214 F.2d 441, 445, the court stated:

"It seems apparent from the language of the statute that it was the intent of Congress to protect interstate commerce against extortion or attempted extortion which in any way or in any degree reasonably could be regarded as affecting such commerce. The exaction of tribute from contractors engaged in local construction work who are dependent upon interstate commerce for materials, equipment and supplies, or who are engaged in constructing facilities to serve such commerce, is, in our opinion, proscribed by the statute in suit."

Thus, the offense consists of two essential elements, (1) extortion or attempted extortion, and (2) that such extortion or attempted extortion affect interstate commerce. In our judgment, and we so hold, venue may be properly laid either in the jurisdiction wherein the coercion is perpetrated or in that wherein commerce is affected thereby.

The judgment is

Affirmed.