UNITED STATES of America,
Plaintiff-Appellee,

v.

Jack GREEN, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

GENERAL LABORERS' LOCAL 397 OF GRANITE CITY, ILLINOIS, Defendant-Appellant.

Nos. 11887, 11888.

United States Court of Appeals
Seventh Circuit.

July 9, 1957.

Rehearing Denied Aug. 13, 1957.

A. M. Fitzgerald, Springfield, Ill., Schaefer O'Neill, Alton, Ill., W. P. Roberts, Springfield, Ill., for appellants.

John B. Stoddart, Jr., U. S. Atty., Marks Alexander, Asst. U. S. Atty., Springfield, Ill., John M. Daugherty, Asst. U. S. Atty., Springfield, Ill., for appellee.

Before DUFFY, Chief Judge, and FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Defendants, General Laborers' Local Union No. 397 (hereinafter referred to as the "Local Union") and Jack Green, were convicted on two counts of an indictment charging violations of the Anti-Racketeering Act sometimes referred to as the Hobbs Act. 18 U.S.C. § 1951. The provisions of the statute are, *inter alia:*

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) * * *

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

"(3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction. * * * *"

The counts charged that, on two separate occasions, each of defendants unlawfully and willfully obstructed, delayed and attempted to obstruct, delay and affect commerce by means of extortion, in that they attempted to obtain from two employers money in the form of wages to be paid for imposed, unwanted, superfluous and fictitious services of laborers commonly known as "swampers" and to accomplish their objectives by wrongful use of actual and threatened force, violence and fear. Subsequent to conviction, the trial court arrested the judgment because it was of the opinion that the indictment did not state an offense under the Act. On appeal by the government to the Supreme Court, pursuant to the provisions of 18 U.S.C. § 3731, the Court, considering only the question of sufficiency of the indictment, reversed, United States v. Green, 350 U.S. 415, 76 S.Ct. 522, 100 L.Ed. 494, holding that the extortion provision of the Act plainly prohibits conduct wherein a union and its representatives, through the use of threats of force, violence and fear, attempt to obtain money from an employer in the form of wages for fictitious, unwanted services, even though the money is not sought for the immediate benefit of the parties indicted.

On this appeal, defendants contend, primarily, that the evidence is insufficient to sustain the verdict. Specifically it is argued that the evidence does not support the conclusion that there were threats of violence or that defendants intended to commit the crime charged. In addition, it is urged that the record does not disclose that "commerce" was affected, and, finally, that reversible error was committed by the court in failing to give certain instructions.

■■ In determining whether there was a sufficient evidentiary foundation to support the verdict, it is elementary that we must view the record in the light most favorable to the government and grant the latter the benefit of all inferences which reasonably may be drawn therefrom. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; Hula-

han v. United States, 8 Cir., 214 F.2d 441, 442. And, it is not our function to weigh the evidence or to inquire into the credibility of the witnesses.

The pertinent facts follow. Defendant Local Union, with headquarters in Granite City, Illinois, is an affiliate of the International Hod Carriers' Building and Common Laborers' Union of America, whose constitution, as well as that of the Local Union, provides that members of other local unions within the jurisdictional limits of defendant Local Union are required to cooperate with its policies. As a result the Local Union had jurisdiction and control, not only over its own members, but also over members of other locals throughout Madison County, Illinois; consequently, in addition to its own 150 to 170 members, it represented approximately 1100 members of other locals. Defendant Green, at the time of the occurrences in evidence, was the business representative of the Local Union.

Each of two contractors, Arthur W. Terry, Jr., of St. Louis, Missouri, and Ralph W. Wright, Jr., of St. Clair County, Illinois, had contracted with the United States Army Corps of Engineers to furnish bulldozers and tractor-scraper units, with operators, for the purpose of repairing a flood control levee located adjacent to the Chain of Rocks Canal, which had been built in order to overcome certain navigational difficulties in the Mississippi River.

Wright began performance of his contract in October, 1952 and, with normal interruptions due to adverse weather conditions, continued until March 26, 1953. Terry began his work March 1, 1953, and, with minimum interruptions, proceeded practically continuously until March 26th. On March 23rd, Green visited Wright's work site and inquired of the operator of one of the machines, "where his laborer was." Green was informed that no "swamper" had been employed. The purpose of the inquiry was to determine whether "swampers", whose primary duty is said to be to scout ahead of the bulldozers and warn of approaching pitfalls, were employed.

Thereafter, on March 26th, five unidentified men approached the same operator and ordered him to park his unit; as a result, work ceased. That evening Wright proceeded to the office of the Local Union in an effort to determine the nature and extent of the controversy. He conversed with Green and, at the trial, testified as follows:

"A. Well, I asked him what the trouble was; and he said we needed a man out there with that 'cat' and scoop. And I told him that we done a lot of maintenance work for the Government and we never did have one before, and I didn't see no need for him being out there, and if I had to have one out there, I would move the 'cat' and scraper out.

"Q. What did he say? A. Well, he said that is the thing to do.

"Q. Did you move your equipment out? A. Yes, sir."

On March 26, 1953, the same day the Wright incident occurred, Terry had a bulldozer and a tractor-scoop unit in operation on the levee. He, too, hired no common laborer. Apparently, at approximately the time of the appearance of the men at the Wright working-place, 6 men arrived at the Terry location and asked the operators to stop working, as there was a dispute which they would like to have settled, namely, the failure to employ "swampers." The workers acceded to the demands, and work was not resumed by Terry until April 13, 1953.

A short time prior to April 13th, Terry, having been directed by the engineering corps to resume performance of his contract, decided to comply. In order to protect himself and his men from further disturbance, two bodyguards were hired. The day before work was resumed Terry informed the sheriff of the sensitive situation. On the morning of April 13th, Terry and the bodyguards, proceeded to the levee, where operations were resumed in the presence of a deputy sheriff. Terry telephoned Green that he was resuming work without a common laborer. Terry's testi-

mony regarding the conversation was as follows:

"The Witness: I identified myself. He said, 'This is Jack Green speaking.' I identified myself, and I said, 'Jack, we are going to start this job out here this morning and we can't—I can't afford to put a laborer on each one of these tractors.' He says, 'Well, you put a laborer on them if you are going to start them.'

"By Mr. Alexander: Q. What was that? A. He said, 'You will put a laborer on each one of these tractors if you are going to start it —if you are going to run it.' I said, 'Well, what are you going to do, are you going to put a picket line up?'

"He said: 'No.'

"I says, 'Well, what are you going to do then?'

"He says, 'Never you mind.' He says, 'I will stop you.'

"I says, 'How are you going to do it?'

"He says, 'You'll see.' * * * ""

In the vicinity of Granite City are many industrial plants which employ members of the Union and others within its jurisdiction. On the morning in question, work at various plants was proceeding as usual, when, without notice to their employers, the union members left their places of employment "as one", and converged at the union hall, where they held a meeting. After the session, this crowd of men, with Green leading the way, moved en masse to the place on the levee where Terry was operating. Estimates of the number of the men in the crowd ranged from 700 to 1500. Upon approaching the job site, a large group circled the only machine in operation and the operator was told to alight. It appears from the record that much harsh language was used by members of the crowd and by Green himself, including such statements as "We ought to bash his head in", "We ought to throw his car in the canal." There was testimony that some of the men kicked the car, and that

Green employed profanity, saying: "get back over to the other side of the river and don't come back, you are a scabby laborer, you are gat-slingers", and "Now you get * * * back over to the West Side, and we don't want to ever see you over here again. What's more I'm running you out of business. You are out of business as of right now. I don't care whether you are on the East Side or on the West Side."

██ In considering the question of the sufficiency of the evidence, it is to be borne in mind that this is a so-called "attempt" case, in view of the fact that no money was ever received. In other words, the contractors never hired the unwanted, unneeded "swampers". After a careful examination of the record, we conclude that there is ample evidence of conduct which could reasonably be found to constitute threats of force and violence in an attempt to instill fear into the employers in order to coerce them into hiring the unwanted labor. It may be true, as defendants insist, that there was no actual physical violence. However, mere threats of bodily harm may suffice. Considering the entire background and circumstances out of which the disputes arose, we think the jury was justified in finding that the language of Green to Wright constituted threats of violence. Similarly, the language of Green to Terry, as well as the appearance and presence of an admittedly hostile crowd, was sufficient to constitute a threat of force and violence instilling fear in the mind of any reasonable man.

██ It is urged that there is no proof of an intent to extort. Clearly, the proof of a general intent to commit the crime charged is a necessary element. Morissette v. United States, 342 U.S 246, 72 S.Ct. 240, 96 L.Ed. 288; United States v. Sutter, 7 Cir., 160 F.2d 754. For the general rule, see 22 Am.Jur. 237, § 13. However, it is axiomatic that a person is held to intend the natural consequences of his acts. The record discloses overt conduct which reasonably constituted threat of physical violence, which admittedly was designed to force

the contractors to hire unnecessary laborers. Defendants must be held to have intended the consequences which would reasonably flow from such conduct.

■ Defendants argue that the court erred in failing to give the following instruction: "A labor dispute exists where a difference has arisen between an employer and a labor organization, or between an employer and employees or other persons, regarding wages, hours, conditions of employment, the manner of performance of work, or the method whereby work is to be performed, regardless of whether the disputants stand in the proximate relation of employer and employee. The court instructs the jury that, if the jury finds that a labor dispute existed between Laborers Local Union No. 397, and Operating Engineers Local Union No. 520 on March 26, 1953 and April 13, 1953, and a jurisdictional dispute is a labor dispute, the jury shall find the Defendants not guilty." Throughout the proceedings, defendants have attempted to brush aside their conduct as constituting merely a jurisdictional labor dispute, beyond the scope of the Anti-Racketeering Act. Such a theory is patently ill-founded. This is clear from the Supreme Court's decision in United States v. Green, 350 U.S. 415, 420, 76 S.Ct. 522, 526, 100 L.Ed. 494: "There is nothing in any of those Acts (referring to the Clayton Act [15 U.S. C.A. § 17, 29 U.S.C.A. § 52], the Norris-LaGuardia Act [29 U.S.C.A. § 101 et seq.], the Railway Labor Act [29 U.S. C.A. § 151 et seq.], and the National Labor Relations Act [29 U.S.C.A. § 151 et seq.]), however, that indicates any protection for unions or their officials in attempts to get personal property through threats of force or violence. Those are not legitimate means for improving labor conditions." There is no doubt that unions have the right to settle disputes peaceably by means of negotiation, and it is equally clear that this act does not curtail any legitimate labor activity. In stressing this fact, the court, in Callanan v. United States, 8 Cir., 223 F.2d 171, 175, approved the following instruction: "The anti-racketeering statute under which the charges are based has no reference or bearing on action by a labor organization leader, honestly acting and representing members of his organization. * * * The act clearly is protective to labor organizations, and labor members, and their membership, as it is to employers." We agree with the decisions that this statute encompasses illegal conduct which may be an outgrowth of a labor dispute just as any other criminal conduct may result from activity originally lawful. The mere fact that conduct originates in exercise of a lawful function does not prevent the ramifications and extensions thereof from becoming unlawful. The court was entirely correct in abstaining from instructing the jury as requested by defendants.

■ Finally, it is contended that there is no evidence of any interference with "commerce". In considering this issue, we are mindful of the language of the court in Hulahan v. United States, 8 Cir., 214 F.2d 441, 445, where it was succinctly stated: "It seems apparent from the language of the statute that it was the intent of Congress to protect interstate commerce against extortion or attempted extortion which in any way or in any degree reasonably could be regarded as affecting such commerce."

■ At the close of the evidence the trial court gave the following instruction to the jury: "[The charge] is a violation by force or threatened force, intimidation of workers or persons concerned in the construction of what is alleged to have been an interstate commerce highway. That is the charge and that is the matter which you must decide here. Now so far as this being an interstate commerce tramway or highway or whatever we may desire to call it, if you believe the testimony of the Government witnesses, it is unquestionably an interstate commerce highway. * * * " It was clearly the function of the court to determine whether interstate commerce was affected and whether the court had jurisdiction under the Act. As stated in

Hulahan v. United States, supra, 214 F. 2d at page 446: "We think it was for the court, and not the jury, to determine whether the Government's evidence, if believed, would bring the activities of the defendant within the statute and sustain federal jurisdiction." See also Nick v. U. S., 8 Cir., 122 F.2d 660, 673, 138 A.L. R. 791.

From the government's proof on this issue, it is obvious that this jurisdictional requirement was properly satisfied. As previously noted, in order to circumvent certain hazards of navigation on the Mississippi River, a most important factor in interstate commerce, a canal some 9 miles in length had been constructed and adjacent thereto the protective levees. Traffic moving down the river was required to enter the canal and travel its length in order to avoid treacherous rock formations in the river. We conclude that the conduct of defendants in interfering with and delaying the maintenance of such protective levees was sufficient to constitute an obstruction of interstate commerce within the meaning of the Act.

The judgment is affirmed.