UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph AMABILE, Defendant-Appellant.

No. 16314.

United States Court of Appeals
Seventh Circuit.

April 26, 1968.

Charles A. Bellows, Chicago, Ill., for defendant-appellant.

Thomas A. Foran, U. S. Atty., Gerald Werksman, Asst. U. S. Atty., Edward V. Hanrahan, U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Gerald M. Werksman, Asst. U. S. Attys., of counsel.

Before SCHNACKENBERG, SWYGERT and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

This appeal is to review Joseph Amabile's conviction for conspiring with Salvatore Battaglia, Dave Evans and non-defendant Rocco Pranno to violate the Hobbs Act (18 U.S.C. § 1951). The gravamen of the charge was that in January 1965, the conspirators obtained $48,500 from the Riley Management Corporation through threats of bodily harm to its president and economic harm to both. Battaglia's and Evans' convictions were affirmed in United States v. Battaglia, 394 F.2d 304 (7th Cir. 1968).

Amabile first argues that the Government failed to prove that he conspired to obtain money from Riley Management Corporation by extortion. A like argument was advanced by Battaglia and Evans and rejected in their appeals. For the reasons stated in the prior opinion, the evidence was sufficient to sup-

port Amabile's conspiracy conviction. See 394 F.2d at p. 310.

Amabile's next point is that his "extortionate threat made against a man [William Riley, president of the Riley Management Corporation] whose business touches interstate commerce" does not violate the Hobbs Act because the threat was only indirectly and remotely connected with interstate commerce. We disposed of this issue in the opinion dealing with Amabile's co-defendants. See 394 F.2d at p. 311. However, since Amabile presses the issue to considerable extent, further discussion may be warranted.

■ The Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L. Ed.2d 252. As to the commerce power, the Supreme Court has recently stated in Katzenbach v. McClung, 379 U.S. 294, 305, 85 S.Ct. 377, 384, 13 L.Ed.2d 290:

> "The power of Congress in this [commerce] field is broad and sweeping; where it keeps within its sphere and violates no express constitutional limitation it has been the rule of this Court, going back almost to the founding days of the Republic, not to interfere."

■■ Since Congress has used all its "broad and sweeping" commerce power in enacting the Hobbs Act, the courts have rightly attributed great scope to the statute. Thus in language applicable here, Judge Sanborn stated as follows in Hulahan v. United States, 214 F.2d 441,

445 (8th Cir. 1954), certiorari denied, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675:[1]

> "It seems apparent from the language of the statute that it was the intent of Congress to protect interstate commerce against extortion or attempted extortion which in any way or *in any degree* reasonably could be regarded as affecting such commerce. The exaction of tribute from contractors engaged in local construction work who are dependent upon interstate commerce for materials, equipment and supplies, or who are engaged in constructing facilities to serve such commerce, is, in our opinion, proscribed by [the Hobbs Act]." (Emphasis supplied)[2]

As in *Hulahan,* Amabile was exacting tribute from a builder "dependent upon interstate commerce for materials, equipment and supplies" and was therefore within the reach of the Hobbs Act. It is unnecessary that the extortion have as substantial an effect on interstate commerce as a combination in restraint of trade. United States v. Malinsky, 19 F. R.D. 426, 428 (S.D.N.Y. 1956).

■ As pointed out in our prior opinion, the $48,500 payment made pursuant to Amabile's threats depleted Riley Management Corporation's reserves. Depletion is pertinent in considering commerce under the Hobbs Act. Thus in United States v. Provenzano, 334 F.2d 678, 692 (3d Cir. 1964), certiorari denied, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544, a Hobbs Act commerce instruction was approved which stated in part:

> "Where the resources of a business are depleted or diminished in any manner or degree by payments of money ob-

---

1. Recent instances where this Court has affirmed Hobbs Act convictions in cases involving construction projects are United States v. Kramer, 355 F.2d 891 (7th Cir. 1966), certiorari denied (except on an irrelevant point), 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed.2d 396, and United States v. Sopher, 362 F.2d 523 (7th Cir. 1966), certiorari denied, 385 U.S. 928, 87 S.Ct. 286, 17 L.Ed.2d 210.

2. The *Hulahan* case has been followed by this Court at least twice: United States v. Floyd, 228 F.2d 913, 916, 918–919 (7th Cir. 1956), certiorari denied, 351 U.S. 938, 76 S.Ct. 835, 100 L.Ed. 1466; United States v. Green, 246 F.2d 155, 160 (7th Cir. 1957), certiorari denied, 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76.

tained by extortion the capacity to efficiently conduct such business is to the extent of the drain on its resources likely to be impaired."

■■ The Hobbs Act does not require that the threats to Riley and his family be directly aimed at interstate commerce. In the statute Congress defined extortion as obtaining property through "actual or threatened force, violence, or fear" (18 U.S.C. § 1951(b) (2)). There is no requirement that the extortion be directed at interstate commerce as long as the extortion "in any way or degree obstructs, delays, or affects commerce" (18 U.S.C. § 1951(a)). To accept appellant's construction would mean that Congress had exempted the most efficacious of threats. Certainly Congress did not intend such an anomalous result.

■ Like his co-defendants, Amabile asserts that the District Court unduly restricted cross-examination. He first asserts that he was not permitted to undermine Riley's testimony that the Lansing, Illinois, building project was meant to be kept a secret from Amabile and Palermo. As we pointed out in our earlier opinion, "Evans' counsel was permitted to elicit that the Riley company had prepared a brochure to promote sales of the Lansing apartments, and that the Hammond Times published a story about the project in August, 1964." 394 F.2d 316. In addition Battaglia's counsel was permitted to cross-examine Riley, without objection, about advertising for the Lansing project, selling units therein before construction, and taking salesmen to Las Vegas to promote this project. It is clear that Amabile was given sufficient latitude to rebut the secrecy of the Lansing project.

■■■■ Amabile also complains of the District Court's refusal to let his counsel ask Riley about the contents of five statements he had given to the Federal Bureau of Investigation, made available to defense counsel under the Jencks Act (18 U.S.C. § 3500). Riley had already testified that he advised the FBI of the 1962–1963 threats of Palermo and Ama-

bile and that he had not read the statements. He of course had no way of knowing whether his complaints of the physical threats of Amabile and Palermo had been transcribed by the FBI in those statements. Amabile's counsel made no attempt to introduce the statements, so that they are not in the record. If the FBI statements were actually devoid of any reference to the Amabile-Palermo threats, Amabile's counsel should have called the recording FBI agents in order to lay a proper foundation for the admission of the five statements to impeach Riley. As Judge Friendly ruled in United States v. Borelli, 336 F.2d 376, 391 (2d Cir. 1964), certiorari denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555:

> "when the witness is confronted with what appears to be an inconsistency, he may deny having made the contradictory statement to the agent and counsel's only recourse would be to call the agent and endeavor to have him prove the contrary."

See also 3 Wigmore on Evidence (3d ed.) § 1025.

Amabile repeats another argument offered by his co-defendants in their appeals, namely, that he was not permitted to show that Riley expected consideration in a state court theft indictment and in a federal tax investigation in return for his testimony herein. We rejected this argument in the prior appeal in the last paragraph of our discussion under "Restriction of Cross-examination and Refusal to Admit Defense Exhibits" (394 F.2d at p. 314). The elaboration of this subject in Amabile's briefs calls for a more detailed discussion.

■■■■ Of course, a defendant may normally show that a prosecution witness expects favorable treatment from the Government in return for his testimony. 3 Wigmore on Evidence (3d ed.) § 967. It is also well settled that the credibility of a witness may not be impeached by showing that he has been arrested and indicted. Michelson v. United States, 335

U.S. 469, 482, 69 S.Ct. 213, 93 L.Ed. 168; United States v. Bolden, 355 F.2d 453, 457 (7th Cir. 1965), certiorari denied, 384 U.S. 1012, 86 S.Ct. 1919, 16 L.Ed.2d 1018; Wigmore, op cit., § 980a. This principle applies *a fortiori* to a federal tax investigation that has not resulted in charges being brought against the witness. In the present case, the District Judge was faced with a collision of these two principles. He was entitled to balance the conflicting interests and therefore did not abuse his discretion in keeping Riley's theft indictment and federal tax investigation from the jury.

Viewed in isolation, Amabile's effort to explore Riley's motives for testifying in the Government's favor might be proper. But we must heed the counsel proffered in Johnson v. United States, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (concurring opinion):

> "In reviewing criminal cases, it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution."

Applying this counsel, Amabile's entire cross-examination of Riley has been scrutinized.

Riley was subjected to a lengthy cross-examination, and Amabile's attempts to go into the state court indictment and tax investigation occurred very early.

Thereafter, on at least seven occasions, Riley was asked questions implying that he was an unsavory character and financially irresponsible.[3] Counsel for Amabile then again sought to return to the state court proceedings against Riley. The series of intervening questions was so obviously improper that there has been no attempt on appeal to justify them. Considering the impropriety of the entire inquiry, it is patent that Amabile's references to the state indictment and federal tax investigation were designed to prejudice the jury against Riley through smear and innuendo rather than to impugn his veracity. Cf. United States v. Pennix, 313 F.2d 524, 528–530 (4th Cir. 1963).

The District Court's rulings are also supportable on the ground that appellant's "questions do not appear sufficiently likely to have developed evidence that would have significantly weakened the Government's case" by showing the witness' bias. United States v. Jones, 360 F.2d 92, 96 (2d Cir. 1966), certiorari denied, 385 U.S. 1012, 87 S.Ct. 721, 17 L. Ed.2d 549. The United States Attorney does not control investigations being conducted by the Internal Revenue Service. Such investigations are common and usually involve no threat of an indictment. As to the state court criminal action, the United States Attorney was of course not empowered to accord any consideration. On this record, the District Court could properly conclude that the questions were speculative, unrelated to the charges against the defendant and not of sufficient probative value to show

---

3. Seven such occasions are as follows:

"Q. Weren't you arrested while you were drunk for exposing yourself?"

\*   \*   \*   \*   \*

"Q. Did you ever get into a fight with a young man at the El Morrocco Club because you were so drunk?"

\*   \*   \*   \*   \*

"Q. As a matter of fact, isn't it true in order to get that loan you bribed one of the officers [of the savings and loan association]?

"A. No, sir.

"Q. And paid him $25,000?"

\*   \*   \*   \*   \*

"Q. Did you know it was an offense against the laws of the United States to bribe an official of a loan association for the purpose of obtaining a loan?"

\*   \*   \*   \*   \*

"Q. Weren't you sued by Margaret Gillespie for fraud?"

\*   \*   \*   \*   \*

"Q. As a matter of fact, you were broke at that time."

\*   \*   \*   \*   \*

"Q. \* \* \* did you sign a check to a payee by the name of Bona for $23,-000 which came back 'NSF'?"

**52**

bias. District of Columbia v. Clawans, 300 U.S. 617, 632, 57 S.Ct. 660, 81 L.Ed. 843;[4] Lott v. United States, 230 F.2d 915, 918 (5th Cir. 1956), certiorari denied, 351 U.S. 953, 76 S.Ct. 848, 100 L.Ed. 1477; Leary v. United States, 383 F.2d 851, 868 (5th Cir. 1967), certiorari granted on another issue, 392 U.S. 903, 88 S.Ct. 2058, 20 L.Ed.2d 1362; United States v. Higgins, 362 F.2d 462 (7th Cir. 1966), certiorari denied, 385 U.S. 945, 87 S.Ct. 316, 17 L.Ed.2d 224; Abeyta v. United States, 368 F.2d 544 (10th Cir. 1966).[5]

Because the United States Attorney was not empowered to influence the course of the state theft case or the tax investigation, and because the questions, in the light of other improper questions to Riley during his cross-examination, were part of a smear campaign, we cannot say that the District Court abused its discretion in its rulings concerning these two subjects.

■ Amabile claims that his counsel was given insufficient time to read a 6-page statement that witness Henry LaKey had given to the FBI.[6] This state-ment was delivered to defense counsel under the Jencks Act at 10 A.M. on April 21, 1967. He had sufficient opportunity to read it from then until 2 P.M., when the usual noon recess ended and the cross-examination of LaKey began. There has been no showing that his cross-examination of LaKey would otherwise have been different if more time had been allowed for study of LaKey's statement. Co-defendants' counsel did not even raise the point on appeal. In the absence of a showing of prejudice, the District Court did not abuse its discretion by allowing only such time as is "reasonably required for the examination of such statement" (18 U.S.C. § 3500 (c)).

■ Battaglia contended on his appeal that the Government should have granted his request for production of Mike DiVito's grand jury testimony. We held that production was unnecessary. See 394 F.2d 304. In addition to DiVito's grand jury testimony, Amabile insists that he was entitled to the minutes of the grand jury testimony of witnesses Henry LaKey and William Riley.[7]

4. In *Clawans*, the reversal of the District Court was affirmed, but the Court observed (300 U.S. at p. 632, 57 S.Ct. 660):
  "The extent of cross-examination rests in the sound discretion of the trial judge. Reasonable restriction of undue cross-examination, and the more rigorous exclusion of questions irrelevant to the substantial issues of the case, *and of slight bearing on the bias and credibility of the witnesses*, are not reversible errors." (Emphasis supplied)

5. Amabile has cited no case holding that it is reversible error to refuse to allow a defendant to show that a prosecution witness is biased because he expects favorable treatment on a pending indictment in another jurisdiction or in a tax investigation. In United States v. Masino, 275 F.2d 129 (2d Cir. 1960), favorable treatment had *actually* been accorded to the witness, and in Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447, the trial judge warned the witness awaiting sentence on a guilty plea that leniency depended upon cooperation with the gov-ernment. Wheeler v. United States, 351 F.2d 946 (1st Cir. 1965), and Harris v. United States, 371 F.2d 365 (9th Cir. 1967), are distinguishable because they involved direct financial benefits to the witness.

6. This statement is part of the record on appeal and took us and Government counsel less than 11 minutes to read. The District Court was able to digest and rule on ten such statements by witness Riley during the April 27th luncheon recess.

7. Excerpts from Riley's grand jury testimony were appended to Battaglia's petition for rehearing of his appeal. They show that Amabile purportedly made the following threat to Riley in 1964 as to the tax investigation of Riley:
  "Don't tell them anything. You know what happens to guys who talk, don't you?"
  Riley replied to Amabile and Palermo:
  "What is the matter with you guys? On one hand you tell me you will kill me if I don't pay you the money; on the other hand these guys [Internal Revenue agents] tell me they will put me in jail."

Each request was made during the cross-examination of these witnesses. We find no error was committed by the District Court's failure to turn over these grand jury minutes.

Amabile relies principally on Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973, but that case adheres to the earlier standard that a trial court need not allow the defense to examine grand jury minutes in the absence of a showing of a particularized need. At the time that Amabile's counsel requested the grand jury testimony of each of these witnesses, unlike counsel for the defendants in Dennis, he did not show particularized need and cannot now supply that requirement by hindsight.

Here, as in United States v. Procter & Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077, and Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323, defendants sought a wholesale disclosure of grand jury testimony as a matter of right, whereas in Dennis the defendants only sought a disclosure of particular testimony.

Moreover, in Dennis, there was a 7-year time lag between the grand jury and trial testimony. Thus as Judge Waterman pointed out in United States v. Youngblood, 379 F.2d 365, 367 (2d Cir. 1967), "there was reason to assay the latter [trial] testimony, some of which is 15 years after the event against the much fresher testimony before the grand jury" concerning occurrences between 1948 and 1955. Here there was no such significant interval between the 1966 grand jury testimony of these witnesses and their 1967 trial testimony.

When Amabile's counsel asked to inspect the grand jury testimony, the Assistant United States Attorney offered to give a copy to the Court for an *in camera* inspection.[8] This offer was not accepted by defense counsel. If it had been accepted, the statements might have been turned over to them, so that any error in this connection was of defendant's own making.

For all these reasons, there was no abuse of discretion in denying production of the grand jury transcripts.

■ In United States v. Youngblood, 379 F.2d 365, 370 (2d Cir. 1967), the Court of Appeals for the Second Circuit promulgated a prospective rule giving the defense access as of right to a witness' grand jury testimony on the subjects about which he testified at the trial, unless the Government can show that access should be denied. At the oral argument of this appeal, the Government stated that it had no objection to such a prospective rule in this Circuit. We approve of the *Youngblood* procedure and adopt it with respect to trials commencing after this judgment is entered.

■ Amabile's final point is that the District Court erred in failing to order a pre-trial preliminary examination before a commissioner pursuant to Rule 5(c) of the Federal Rules of Criminal Procedure.[9] However, by its terms, Rule 5 was meant to afford an arrested person an opportunity to challenge the existence of "probable cause to believe that an offense has been committed and that the defendant has committed it." As the Supreme Court has stated, a preliminary hearing under Rule 5 is not required where, as here, an indictment has already been returned (Jaben v. United States, 381 U.S. 214, 220, 85 S.Ct. 1365, 14 L.Ed. 2d 345), for the grand jury already has found probable cause for holding the defendant for trial. Bayless v. United

---

8. The Supreme Court has not disapproved of *in camera* inspection by a trial court in order to enable it to rule on a defense motion for production of grand jury testimony. Dennis v. United States, 384 U.S. 855, 874, 86 S.Ct. 1840, 16 L.Ed. 2d 973.

9. Rule 5(c) provides in pertinent part:
"* * * If the defendant does not waive examination, the commissioner shall hear the evidence within a reasonable time. The defendant may cross-examine witnesses against him and may introduce evidence in his own behalf. * * *"

States, 381 F.2d 67, 71 (9th Cir. 1967), Sciortino v. Zampano, 385 F.2d 132, 133 (2d Cir. 1967), certiorari denied, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873.[10] Neither the language of Rule 5 nor its history supports Amabile's assertion that its purpose was to afford pre-trial discovery.

The judgment of the District Court is affirmed.

SWYGERT, Circuit Judge (dissenting).

I am constrained to dissent on several grounds. First, I adhere to the views expressed in my dissent in United States v. Battaglia et al., 394 F.2d 318 (7th Cir. Jan. 9, 1968) that there was insufficient evidence of a conspiracy engaged in by Amabile with Battaglia and Evans "to obstruct, delay and affect commerce" in the movement of materials for the construction of the Riley dwelling units in Lansing, Illinois by means of extortion.

Second, regardless of the question of the sufficiency of the evidence to show a conspiracy to extort money, there was no proof of a violation of the Hobbs Act, 18 U.S.C. § 1951. Although this issue was presented obliquely in the Battaglia appeal, Amabile has advanced arguments which bring the question into sharper focus.

The evidence showed that during the construction of the Lansing project, Riley obtained building materials from suppliers located outside the State of Illinois. There was no evidence, however, that there was any delay in the shipment or delivery of these materials. Moreover, there was no evidence that any extortion threat directed against Riley carried with it, express or implied, a threat that the work on the Lansing project would be stopped or hindered.

In United States v. Pranno, 385 F.2d 387, 389 (7th Cir. 1967), cert. denied,

390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132 (Mar. 5, 1968), we said:

> The Supreme Court has made it clear that the statute is to be construed broadly and is not limited to conduct which directly and immediately obstructs a particular movement of goods in interstate commerce. Extortion by threat to disrupt a local activity the stoppage of which would in turn result in stoppage of interstate shipment of raw materials essential for that activity falls within the act. The statute seems to be read as not only prohibiting the obstruction of commerce by extortion, but also prohibiting extortion by any threat, *the carrying out of which would obstruct commerce*. (Emphasis added.)

I interpret this statement to mean that a threat to extort proscribed by the Hobbs Act must have a reasonable causal relation to interstate commerce. The likelihood of an obstruction to the flow of commerce must be the result of the threat. This essential nexus is missing in the instant case.

The majority, quoting from Hulahan v. United States, 214 F.2d 441 (8th Cir.), cert. denied, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954), says that "Amabile was exacting tribute from a builder 'dependent upon interstate commerce for materials, equipment and supplies' and was therefore within the reach of the Hobbs Act." The facts in that case, however, were entirely different from those presented here. There the defendant, a labor union representative, conspired to extort money from local construction companies by threats of labor unrest. These companies were dependent for the continuation of work undertaken by them upon local labor represented by the defendant and upon supplies and materials shipped interstate. Thus the extortion threats, if not complied with, would in all probability have brought a cessation of work on the proj-

---

10. In *Sciortino*, Judge Hays showed that the contrary rule in Ross v. Sirica, 380 F.2d 557 (D.C.Cir.1967), was not sup- ported by a majority of that Court, nor has it been adopted in any other Circuit. See 385 F.2d at p. 134.

ect, thereby interrupting the interstate shipments of construction materials. In the instant case, however, there was no such probability that Amabile's threats to Riley, if not complied with, would have resulted in the interruption of the shipment of construction supplies and materials for the Lansing project. (In fact, it was to Amabile's advantage that the Lansing project proceed without interruption; for only then would Riley have authorized Carlson Construction Company to request "draws" for funds upon the Lawn Savings & Loan Association).

The majority also makes reference to the fact that the "$48,500 payment made pursuant to Amabile's threats depleted Riley Management Corporation's reserves." If a depletion of reserves is all that is necessary to show the requisite affect on commerce, then a threat of any kind to extract money made to a person who happens to operate a business engaged to any extent in interstate commerce comes within the statute's proscription. Under this rationale, a retail store owner, for example, would be afforded federal protection from extortion, regardless of the nature or the likely affect of the threat, simply because his stock of merchandise had in some measure moved in interstate commerce. I do not believe that the Hobbs Act was intended to have such a broad reach. In that connection, Judge Hastie's statement in his dissent in United States v. Stirone, 262 F.2d 571, 578, 579 (3d Cir.

1958), rev'd on other grounds, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), is pertinent:

[I]t should be considered and kept in mind that the control and punishment of local extortion is primarily the business of local or state government. The Hobbs Act is an auxiliary and partially duplicating federal superimposition on state law enforcement. In the view of Congress this is a desirable measure of federal assistance to the states in the exercise of their police power. But where state power and responsibility are thus primary and the national government is merely performing an auxiliary function, we should not be eager to stretch federal jurisdiction to cover doubtful cases offering only a tenuous or speculative theory of federal jurisdiction.[1]

Third, an error which alone would require reversal (presented rather cursorily in the Battaglia and Evans appeals) relates to the district judge's restriction of Amabile's cross-examination of William J. Riley. Counsel for Amabile attempted to bring before the jury the facts that Riley was under indictment for theft in the state court, that he was under investigation by the Internal Revenue Service for tax evasion, and that his testimony was given in the hope of securing favorable treatment from local and federal law enforcement officers concerning his allegedly illegal conduct. The district judge refused to permit cross-examination on these subjects.[2]

---

1. The majority quotes from Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 1377, 13 L.Ed.2d 290 (1964), to support the proposition that, "Since Congress has used all its 'broad and sweeping' commerce power in enacting the Hobbs Act, the courts have rightly attributed great scope to the statute." I respectfully submit that the abstract language quoted from *McClung* has no application to the instant case. A decision upholding the constitutionality of the Civil Rights Act of 1964 under the commerce power can hardly have pertinency to the intended scope of the Hobbs Act.

2. The relevant portion of the transcript reads:
   [Mr. Bellows, Amabile's counsel:]
   Are you the same William G. Riley who was indicted by the Criminal Court of Cook County for thievery in 1966 in the month of February.
   Mr. Lamendella: [Assistant United States Attorney] I will object to that, your Honor.
   The Court: I will sustain the objection. Mr. Bellows, you know better than that.
   Mr. Bellows: I will connect it up, your Honor.

The majority concedes that when "viewed in isolation" defense counsel's "effort to explore Riley's motives for testifying in the Government's favor might be proper." The majority goes on to say, however, that a defendant's

The Court: Mr. Bellows, you know better than that and I direct the jury to disregard that question.

By Mr. Bellows:

Q. Are you under indictment in the Criminal Court Cook County?

Mr. Lamendella: I will object to that.

The Court: I sustain the objection and I direct counsel, Mr. Bellows, to refrain from asking that kind of question. I direct the jury to disregard that question.

Mr. Bellows: May I have a sidebar conference, your Honor, with reference to this?

The Court: No, no side-bar conference after those questions, sir.

Mr. Bellows: May I be permitted to make an offer of proof outside of the presence of the jury?

The Court: In respect to that last question, you may.

\*　　\*　　\*　　\*　　\*

Mr. Bellows: Your Honor, my offer of proof is as follows: I expect to show by cross examination and it may be verified, if you choose to do so, if he denies the fact, that he was indicted in the month of February, 1966, for the crime of theft which is a felony; that the matter has been pending now over a year and that the reason for the extraordinary delay in bringing this matter to justice for a crime of theft —actually it was forgery, but under our new statute, your Honor, it is considered to be theft—is that he expects to get consideration, your Honor, from the court and the prosecution in Cook County for his cooperation with the government in this case and for his testimony in this case.

For that reason, your Honor, I think it is extremely important to show motive and reason for his testimony in this case.

The Court: What is the government's position in respect to the offer of proof of the defendant Amabile?

Mr. Lamendella: May we have just a moment?

The Court: Yes.

Mr. Lamendella: If this offer is being made, your Honor, to impeach the witness on the basis of an indictment, we object.

The Court: Do you object to the offer?

Mr. Lamendella: Yes, we do.

The Court: I sustain the objection. Bring in the jury.

Mr. Bellows: May I add one more point, your Honor?

The Court: I have ruled on your offer. You can't add to an offer once it is made, sir.

Mr. Bellows: I want to explain the position of Lamendella to be inconsistent with my offer. He says he objects to the indictment. This is beyond the indictment.

The Court: He said he objected to the offer.

Mr. Bellows: Well, he said to the indictment.

The Court: You object to the offer of proof?

Mr. Lamendella: I do, your Honor.

\*　　\*　　\*　　\*　　\*

The Court: You may continue, Mr. Bellows, with the cross examination of this witness.

By Mr. Bellows:

Q. Mr. Riley, are you presently under investigation by the Internal Revenue for evasion of taxes?

Mr. Lamendella: I will object to that, your Honor.

The Court: I sustain the objection.

Mr. Bellows: May I make another offer of proof?

The Court: Yes.

\*　　\*　　\*　　\*

Mr. Bellows: My offer of proof, your Honor, is that Mr. Riley, the witness on the stand, is presently under investigation by the Internal Revenue; that he has two lawyers prominent in the tax field in criminal cases representing him, and that if he were cross examined, your Honor, he would admit, I am sure, that he knows that his financial affairs are under investigation by the Internal Revenue for failure to account for taxes and for the evasion of taxes, and that his books are in the hands of the Internal Revenue agents, and that he expects to get consideration, your Honor, from the government for his cooperation with them in this case and for his testimony in this case.

The Court: What is the position of the government in respect to the offer of proof of the defendant Amabile?

Mr. Lamendella: We object, your Honor.

The Court: I sustain the objection.

\*　　\*　　\*　　\*　　\*

right to show that a prosecution witness expects favorable treatment from the Government in return for his testimony must be balanced against the rule that the credibility of a witness may not be impeached by showing that he has been indicted or is under investigation, and that the balancing of these conflicting rules entitled the district judge to use his discretion in deciding whether to permit cross-examination on Riley's expectation of favorable treatment.

I do not believe that a conflict between these evidentiary rules, such as the one the majority attempts to erect, exists. The right of a defendant in a criminal prosecution to cross-examine witnesses testifying against him is guaranteed by the sixth amendment to the Constitution. Courts have not been grudging in their protection of this right. As the Supreme Court recently stated in Pointer v. State of Texas, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965):

> There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of * * * cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.

Both the treatises and the case law recognize the propriety of the kind of cross-examination in which Amabile's counsel sought to engage. Thus Professor McCormick says:

> The law recognizes the slanting effect upon human testimony of the * * * self-interest of the witness in the outcome of the case. Any such partiality, proceeding from any acts, relationships or motives, may be proven to impeach credibility * * *. [One such instance is] in a criminal case when the witness testifies for the state and it is shown that an indictment is pending against him, * *

C. McCormick, Handbook of the Law of Evidence § 40, at 82, 83, 84 (1954). See Harris v. United States, 371 F.2d 365 (9th Cir. 1967); Wheeler v. United States, 351 F.2d 946 (1st Cir. 1965); United States v. Masino, 275 F.2d 129 (2d Cir. 1960). As the Second Circuit observed in *Masino:*

> Cross-examination is proper when its purpose is to reveal bias or interest on the part of the witness being examined. * * * It was highly relevant and material to bring out that the state court charge * * * had been quashed upon the intercession of the Assistant United States Attorney as was claimed by the defense and not denied by the government.[3] This is the kind of situation where the widest possible cross-examination should be permitted. The appellant was entitled to have the jury know what had happened with respect to the charge, including any part which representatives of the government had played, so that the jury could draw its own conclusions with respect to possible motives for Brown's testimony. 275 F.2d at 132.

It is apparent from the record that the district judge perceived no "collision" of the kind suggested by the majority. Moreover, any attempt to show the bias of a witness by evidence that he is under indictment or investigation would create the same "collision." Thus the rule enunciated by the majority might preclude cross-examination of this kind in every case, a result contrary to the general rule permitting such inquiry. I believe that Amabile's efforts to question the credibility of Riley by showing his relationship to the Government and the reward he hoped to gain by reason of his testimony was entirely proper and should have been permitted.

---

**3.** The majority says, "As to the state court criminal action, the United States Attorney was of course not empowered to accord any consideration." This observation ignores the possibility that the United States Attorney might have interceded with the local authorities on behalf of Riley, a situation similar to that occurring in *Masino.*

Finally, the prejudicial trial errors discussed in my dissent in *Battaglia*, other than the exclusion of the testimony of character witnesses on behalf of Evans, have equal applicability to the instant case. These errors additionally and cumulatively require a reversal.