**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Roy E. KRAMER, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Matthew BREEN, Defendant-Appellant.**

**Nos. 14962, 14963.**

United States Court of Appeals
Seventh Circuit.

Jan. 10, 1966.

Rehearing Denied Feb. 10, 1966.

Certiorari Granted in Part and Denied in Part April 25, 1966.

See 86 S.Ct. 1366.

Anna R. Lavin, George J. Cotsirilos, Frank J. McGarr, William Gibbons, Chicago, Ill., for appellant.

Edward V. Hanrahan, U. S. Atty., John Peter Lulinski, John Powers Crowley, David Philip Shippers, Jr., Chicago, Ill., for appellee, Lawrence Jay Weiner, Asst. U. S. Atty., of counsel.

Before DUFFY and SWYGERT, Circuit Judges, and GRUBB, Senior District Judge.

GRUBB, Senior District Judge.

The consolidated appeals are taken from judgments of conviction based on jury verdicts of guilty as charged in Counts One and Two of a Ten-Count Indictment. Count One charged defendants Roy Edward Kramer and Matthew Breen with a violation of § 1951, Title 18 U.S.C.A., commonly known as the Hobbs Act. Kramer was the sole defendant in Count Two which states a violation of § 186(b), Title 29 U.S.C.A., § 302(b) of the Labor Management Relations Act of 1947, as amended in 1959.

The charges arose out of certain transactions which took place between one George E. Noldan, the owner of D. and N. Ironworks, Incorporated, of Niles, Illinois; Kramer, who was an officer of Local 393, Bridge, Structural Re-inforcing Steel and Ornamental Ironworkers, Riggers and Machinery Movers Union of Aurora, Illinois, and Breen who was an ironworks contractor. On June 1, 1961, Noldan's company obtained the sub-contract for the reinforcing structural and ornamental steel work on new construction in Aurora, Illinois, for the Illinois Bell Telephone Company. The building on completion was intended to house a local dial central office for customer dialing of local, toll, intra- and interstate telephone traffic. The sub-contract carried an oral stipulation that Noldan would have men on the job the following day or he would lose the contract immediately.

From the evidence of record the jury could find that on the day the sub-contract was let, the job supervisor for the general contractor on the construction and the foreman for Noldan's company went to see Kramer, the business agent and financial secretary and treasurer of Local 393, and asked him to furnish ironworkers to unload reinforcing steel for the Illinois Bell Telephone job. Kramer questioned why a local contractor did not get the job and told them that they could not have the men because 48 hours' notice was required.

It was Kramer's function to determine which men were to be sent on a given job. On other occasions, when an order was put in for ironworkers, the men were sent out the following day or sometimes in two days. No men were furnished in this instance and the general contractor had to unload the steel for the Illinois Bell Telephone job himself.

Early in June, one Ruckino DiCarlo, a concrete construction contractor who had known Noldan and Breen for more than ten years, contacted Breen on behalf of Noldan. Breen, a member of the local contractor's association, had been an unsuccessful bidder on the Illinois Bell Telephone construction. DiCarlo told Breen that Noldan had the ironwork contract and needed good men "to make out." Breen answered that he could do nothing since it was supposed to have been his job. After talking to Noldan, DiCarlo called Breen again to inquire what could be done for his friend. Breen said that if Noldan needed help "it is going to cost him." DiCarlo then contacted Noldan and once more called Breen. He was told by Breen that it would cost $3,000.

After this last telephone conversation, DiCarlo called on Breen to see if the amount could be reduced or made in partial payments. Breen stated that it would have to be in one lump sum. After contacting Noldan, DiCarlo again called Breen to ask if he would take $50 or $100 a week. Breen refused. It would have to be in one lump sum because it had to be divided among so many people. If Noldan paid $3,000, he would have good men

and be able to make up the $3,000 by having good apprentices, good journeymen, and he would be able to use his own men and work shorthanded. If Noldan did not have $3,000, Breen said he shouldn't be in the business.

The ironworkers furnished to Noldan in June and July were poor in quantity and quality. On August 1, 1961, he called Kramer and said that he understood Kramer wished to see him. Noldan and Kramer met on August 2, 1961. Kramer said he knew he was giving Noldan a hard time and asked him what it would be worth to resolve his labor difficulties. Noldan told him that he could not afford to come up with $3,000. Kramer replied, "Well, this is the reason that we have adjusted the figure downwards." He inquired what Noldan could afford and stated that $400 or $500 would not be adequate since it would have to be split three or four ways. He further stated that his people had offered to make or adjust the amount downward to a figure of about $1,000, and wondered if Noldan could manage this sum. Noldan said he could not handle the amount in "one piece," but could pay it as a payroll expense of about $100 a week. Kramer stated that he would have to talk to his people. He called Noldan the next morning and informed him that the deal was all right with his people and that Noldan could lay off the men that were on the job, referring thereby to the slow ironworkers previously furnished.

Noldan again talked to Kramer on August 4 and August 7 and was assured that men would be available when necessary. The work progressed well and there was no further labor trouble. On August 18, Noldan again called Kramer to confirm the financial arrangements. His offer to pay by check was rejected; Kramer wanted it "fresh."

Noldan made three payments of $100 each on August 23, September 1, and September 22, 1961, respectively. On the date of the last payment, agents of the FBI confronted Kramer. After this date, the work proceeded very poorly.

The Illinois Bell Telephone building was not completed until six weeks after the scheduled completion date. Various delays in construction were caused by labor difficulties.

In the construction of the Illinois Bell Telephone building materials were used which came from sources outside of the State of Illinois. Included in these materials were cut stone and steel channels. The latter commodities were furnished to Noldan from inventories within the State of Illinois, which came from sources in Indiana on July 20, 1961.

Kramer contends that he has been charged with and convicted of offenses which are mutually inconsistent through performance of the same acts. He further challenges the sufficiency of the proof as to various elements of the offenses and claims that there was prejudicial error in evidentiary rulings, in the denial of severance for trial, in allowance of improper argument to the jury and in the charge to the jury. Breen challenges the sufficiency of the proof to sustain his conviction and also claims prejudicial error in evidentiary rulings, in the charge to the jury, in the denial of his request for severance and for waiver of the jury.

*Consistency of Offenses*

The contention as to the inconsistency of the charges of the indictment and the convictions is based on a misconception as to the scope of the misdemeanor offense under the Labor Act.

In the enactment of § 186(b), Title 29 U.S.C.A., the Labor Management Relations Act of 1947, as amended 1959,[1]

---

1. "§ 186. *Restrictions on payments and loans to employee representatives, labor organizations, officers and employees of labor organizations, and to employees or groups or committees of employees; exceptions; penalties; jurisdiction; ef-*

*fective date; exception of certain trust funds*

\* \* \* \* \*

"(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any

Congress did not intend to duplicate state criminal offenses. It was concerned with adequate criminal sanctions for conduct that would corrupt the collective bargaining process, including all forms of bribery and extortion. See Analysis of Labor-Management Reporting and Disclosure Act of 1959, 1959 U.S.Code Cong. & Ad. News, 2318, 2360, and Arroyo v. United States, 359 U.S. 419, 424–426, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959).

■ The terms of the statute are not limited to receipt and acceptance which may be passive, but also penalize the request and demand of any payment. The words "request" and "demand" are not qualified. They contemplate a situation where an employee representative might resort to pressure to obtain payment by conduct that may be characterized as coercive. Arroyo v. United States, supra, at 426, 79 S.Ct. 864.

■ The Hobbs Act, § 1951, Title 18 U.S.C.A.[2] proscribes interference with commerce by threats or violence. It comprehends the offense of extortion. § 186 (b) of Title 29 U.S.C.A., of the Labor Act, states a misdemeanor offense, independent and separate from that of the Hobbs Act felony. When the charge under the Labor Act is based on a coercive demand or request by a representative of employees, this conduct may also constitute extortion under the Hobbs Act. The fact that the same conduct may give rise to separate and independent violations of law does not render the charges or convictions based thereon inconsistent or mutually exclusive.

*Sufficiency of Proof*

The sufficiency of proof has been challenged as to the element of interstate commerce under the Hobbs Act; the element of fear as part of the proof concerning extortion under the Hobbs Act; the status of Kramer as a "representative" of employees under the Labor Act; the interstate nature of the employment of the employees represented by Kramer for purposes of the Labor Act; and the willfulness of Kramer's conduct under the Labor Act. Breen also challenges the lack of substance of the totality of the evidence to sustain his conviction under the Hobbs Act.

■ The Hobbs Act prohibits conduct that "obstructs, delays or affects commerce or the movement of any article or commodity in commerce." The broad language contemplates interference with commerce in "any way or degree." Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

■ The test of interstate commerce under the Hobbs Act differs from that under the Sherman Act. Carbo v. United States, 314 F.2d 718, 732 (9th Cir. 1963), cert. denied 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498. Similarly, decisions construing the interstate commerce requirement under the Fair Labor Standards Act are not controlling as to the requisite manner or degree of interference with commerce that may justify conviction under the Hobbs Act.

■ The intended use of the Illinois Bell Telephone building as housing for an

money or other thing of value prohibited by subsection (a) of this section."

2. "§ 1951. *Interference with commerce by threats or violence.*

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—* * *

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

"(3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."

interstate commerce facility presents a more direct involvement with commerce than did the construction of a building intended for the manufacture of goods ultimately destined for shipment in commerce as in Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The question whether or not construction of such a building, standing alone, would satisfy the interstate commerce aspect of the Hobbs Act, which was left undecided by the Supreme Court in Stirone, need not be determined in the instant case since there are additional factors bearing on this question. The construction of the building utilized materials moving in commerce such as cut stone. Although the steel channels installed by Noldan were obtained from local inventories, delay in their installation may be deemed to have resulted in delay in the replenishment of such inventories by commodities moving from outside the State of Illinois.

The totality of interstate aspects that were subject to obstruction by delay in the construction shown here suffices to satisfy the interstate commerce element of the Hobbs Act.

It is submitted that Noldan was induced by reasons other than fear to part with his money. There was no evidence of any direct threat or refusal to supply good ironworkers. Nevertheless, the activities of Kramer and Breen strongly conveyed the impression that there would be labor difficulties unless and until Noldan agreed to pay. Breen told DiCarlo that it would cost Noldan $3,000 to get good workers. Kramer asked Noldan what it would be worth to end the hard time he had been giving him.

The prospect and the experience of unwarranted labor difficulties such as the unavailability of workers and being furnished with inadequate workers with resultant delay in the performance of a construction contract present a threat of financial loss to the contractor. Noldan testified that he paid because he did not want to see his business "go out the window." The jury could infer that Noldan's fear of economic loss was rea-

sonable and that it induced him to make the payments. Conduct that brings about a state of mind of fear of financial loss constitutes extortion under the Hobbs Act. United States v. Dale, 223 F.2d 181, 183 (7th Cir. 1955); United States v. Postma, 242 F.2d 488, 492 (2nd Cir. 1957), cert. denied 354 U.S. 922, 77 S.Ct. 1380, 1 L.Ed.2d 1436.

Respecting the question of Kramer's status as a representative of employees under the Labor Act, one Robert Benson testified that Kramer was the financial secretary and treasurer as well as the business agent of Local 393 during the indictment period. As business agent, Kramer was the recognized representative of the Local and had jurisdiction of all stewards; he would send men on jobs and try to solve all difficulties on jobs to the best interests of all sides. Benson, a fellow officer in Local 393, had first-hand knowledge of the nature and scope of Kramer's duties and authority.

The challenge to this evidence rests on the premise that the testimony of Benson was incompetent to establish the scope of Kramer's agency because Benson was a fellow agent. The objection is not valid. The testimony was not offered for the purpose of binding the principal, that is, the membership of Local 393, but to establish Kramer's status in order to determine whether his conduct was actionable under the Labor Act. For this purpose, Benson's testimony is appropriate. It establishes without contradiction that Kramer was a representative of employees within the purview of Section 186(b), Title 29 U.S. C.A. United States v. Ryan, 350 U.S. 299, 302, 76 S.Ct. 400, 100 L.Ed. 335, (1956)

For purposes of the Labor Act, which demonstrates the full reach of congressional power under the Commerce Clause of the United States Constitution, the members of Local 393 may be deemed to have been employed in an industry affecting commerce. They work in all phases of ironwork; structural, ornamental, machinery moving and reinforcing. In this case, they participated in the construction of a building intended

as housing for an interstate facility. They handled materials that had moved in interstate commerce. See United States v. Pecora, 267 F.2d 512, 515, 516 (3rd Cir. 1959).

▇▇ Kramer also contends that the evidence does not suffice to establish the willfulness of his conduct found to violate the Labor Act. The pattern of Kramer's activities—the negotiating and bargaining with Noldan concerning the amount and manner of payment, his gratuitous advise as to how to stay out of trouble with the income tax people in the transaction, and the acceptance of three payments of $100 each—satisfies the element of willfulness under Section 186 (b), Title 29 U.S.C.A. United States v. Keegan, 331 F.2d 257 (7th Cir. 1964), cert. denied 379 U.S. 828, 85 S.Ct. 57, 13 L.Ed.2d 37.

Breen submits that the evidence against him does not suffice to sustain his conviction under the Hobbs Act. The record shows no direct contact between Breen and Noldan. Neither Kramer nor Breen mentioned the other's name in their dealings with Noldan and DiCarlo. Breen's involvement in the extortion scheme is shown principally by the conversations he had with DiCarlo in June 1961. However, the import of these conversations, considered in light of subsequent events, is highly incriminatory.

Breen indicated the cost of resolving Noldan's labor difficulties as $3,000 to be split among several parties. His comment that Noldan should not be in the business if he could not afford to pay this amount to get good union help, after he was made aware of Noldan's troubles in being able to meet the required performance under his subcontract on the Illinois Bell Telephone construction, may be considered as a veiled threat—pay or else! When Noldan, after experiencing continued difficulties, finally contacted Kramer some two months later, Kramer acknowledged that Noldan could not afford the previously discussed payment and indicated that "his people" had agreed to adjust the figure. Breen's

earlier promises of good workmen, good journeymen and the right to work short-handed support a reasonable inference that there was a link between Breen and someone with Local 393 who had authority to implement these promises. That Kramer was that person, is confirmed by his knowledge of the previous discussions.

▇▇ Four months after the indictment issued in this case, at a negotiating meeting between contractors and officials of Local 393, Breen, referring to his relations with the Local at a time "a few years ago," said: "I was the boss. I called the shots. I gave the orders. I told Kramer what to do." These statements, considered in light of his earlier promise of cooperation if Noldan met the price further confirms the fact that Breen and Kramer were acting together in the extortion scheme during the indictment period.

▇▇ The post indictment statement constitutes an admission on the part of Breen. Voluntarily made at a time when Breen was already facing the Hobbs Act charge, it may be deemed trustworthy. Its substance is corroborated by the gist of his earlier statements to DiCarlo, by Kramer's familiarity with the proposals, by Kramer's need to obtain the approval of "his people" before confirming the arrangement and, generally, by the sequence of events which showed that the labor difficulties ended when Noldan promised to pay. Under these circumstances, Breen's post indictment admission is admissible in evidence against him. Opper v. United States, 348 U.S. 84, 91, 92, 75 S.Ct. 158, 99 L.Ed. 101, 45 A.L.R.2d 1308 (1954).

▇▇ On appeal, the evidence is viewed in a light most favorable to the government, together with all reasonable inferences which might have been drawn therefrom. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Iacullo, 226 F. 2d 788, 795 (7th Cir. 1955), cert. denied 350 U.S. 966, 76 S.Ct. 435, 100 L.Ed. 839. There is substantial probative evidence of record, direct and circumstantial, to support the verdict against Breen.

*Severance*

 Kramer and Breen contend that each was prejudiced by the denial of severance for trial. As to the receipt into evidence of Breen's post indictment statement, the trial court adequately instructed the jury at the time of admission and again during the course of the charge that this statement was not to be considered against Kramer. No prejudice is to be inferred from this instance. Anderson v. United States, 270 F.2d 124, 126 (6th Cir. 1959); United States v. Glasser, 116 F.2d 690, 701 (7th Cir. 1940), aff'd. 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; and see Schaffer v. United States, 362 U.S. 511, 515–517, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960).

Although the evidence showed that Kramer was the person who arranged the final details and received the payments in the scheme, the proof against Breen was not so insubstantial that the finding of his guilt must be deemed to have resulted from the impact of the case against Kramer.

 The same series of transactions gave rise to the charges against Breen and Kramer. The proof presented no unusual difficulties or complexities that might have tended to confuse the jury in assessing the evidence relating to either defendant. There was no abuse of discretion in the denial of the requests for severance. Opper v. United States, 348 U.S. 84, 94–95, 75 S.Ct. 158, 99 L.Ed. 101, 45 A.L.R.2d 1308 (1954). The unusual circumstances underlying the decision in United States of America v. Echeles, 352 F.2d 892 (7th Cir. 1965)[3], have not been shown to be present in the case. Perhaps Breen and Kramer might have had a better chance of acquittal if each had stood trial separately. This possibility does not give them the right to severance if the entire record discloses that their joint trial was without prejudice to either defendant. Robinson v. United States, 93

U.S.App.D.C. 347, 210 F.2d 29, 32 (D.C. Cir. 1954).

*Waiver of Jury*

 The claim of prejudice in the denial of the request for waiver of jury by Breen is based on the potential effect which disclosure of a prior murder conviction might have had on the jury if Breen had elected to take the stand.

It may not be surmised that the jury would have been inflamed or that the publicity attendant such a disclosure would have prevented the jury from making a fair assessment of the evidence against Breen. The hypothetical prejudice does not give rise to the exceptional situation which might render impartial trial by jury unlikely or impossible, thereby furnishing a compelling reason for rejecting the government's insistence on its right to consent to the waiver under Rule 23(a) of the Federal Rules of Criminal Procedure Title 18 U.S.C.A. Singer v. United States, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965); and see United States v. Igoe, 118 U.S.App.D.C. 30, 331 F.2d 766 (7th Cir. 1964), cert. denied 380 U.S. 942, 85 S.Ct. 1020, 13 L.Ed.2d 961.

*Instructions*

 The trial court did not give a requested definition of interstate commerce which was substantially similar to that of the Hobbs Act, but left the determination of the existence of this element to the jury with this charge:

"If you believe the testimony of the government witnesses with reference to where the various materials came from which were supplied to the Illinois Bell job and with reference to the use to which the building upon which the work was to be performed would be put, and if you find that the defendants' activities as shown by the government's testimony did delay, obstruct and affect interstate commerce in any way or degree—because that language is used in the statute—then you may

---

3. The need for severance in the Echeles case was based principally on the fact that one defendant was unable to elicit

in a joint trial an exculpatory statement previously made by a co-defendant.

find that the government has established the requisite element of effect on interstate commerce under the Hobbs Act."

This charge defines interstate commerce by implication. Although a more precise definition in the words of the statute is to be preferred, see for example, LaBuy, Manual on Jury Instructions— Criminal, Section 15.02 "Offenses of Labor Racketeering," 36 F.R.D. 457, 596, the charge in this case was not so inadequate that the jury could not determine the question fairly.

 In respect to the instruction concerning the common plan of Kramer and Breen, charged in Count One of the Indictment, it is contended that the jury would have been confused in this case, which involved only two defendants, by the statement:

"* * * If there was a common plan and one of the defendants was not a party to it, then what I am about to say is not applicable to that defendant."

In the context of the substantial and clear instructions concerning the common plan and the admissibility of evidence against either defendant under such a charge, this single sentence was not likely to confuse the jury. There was no prejudicial error in the instructions.

Other grounds raised by defendants on which to set aside the convictions are without merit: Counsel complains of prejudicial error in the limitation of cross-examination. It appears that the line of questioning rejected by the court related to prior dealings between Kramer and Noldan and was offered on the question of Noldan's state of mind as to his fear of injury to his business. The rejected line of questions is neither relevant nor within the scope of the direct examination in the case. There was no abuse of discretion in the ruling. See United States v. Lawinski, 195 F.2d 1, 7, 8 (7th Cir. 1952).

Defendants also contend that counsel for the government exceeded proper argument to the jury by the statement that Noldan was a "giant" for testifying in the case. Allowance of this zealous effort to build up the witness falls short of constituting prejudicial error. See United States v. Achilli, 234 F.2d 797, 802 (7th Cir. 1956) aff'd 353 U.S. 373, 77 S.Ct. 995, 1 L.Ed.2d 918 (1957).

The judgments of conviction are affirmed.