**UNITED STATES of America, Plaintiff-Appellee,**

v.

**George DeMET, Defendant-Appellant.**

**No. 72–1657.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1973.

Decided Oct. 25, 1973.

Rehearing Denied Nov. 26, 1973.

James G. Demopoulos, Chicago, Ill., for defendant-appellant.

John J. Robinson, Appellate Section, Crim. Div., U. S. Dept. of Justice, Washington, D. C., James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and KILEY and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

Defendant was convicted by a jury of obstructing, delaying and affecting commerce and the movement of articles in commerce by extortion in violation of 18 U.S.C. § 1951, commonly called the Hobbs

Act.[1] On this appeal defendant asserts error in jury selection, insufficiency of the evidence as to extortion and effect on interstate commerce, and erroneous rulings during the course of trial. We have considered these contentions, find none meritorious and affirm the conviction.

Viewing the evidence in a light most favorable to support the verdict, the following facts appear:

Louis King owned a Chicago cocktail lounge called "The Scene" during the period covered by the indictment, November, 1969 to February, 1970. King purchased some of the beer for his business from the Chicago branch of Anheuser-Busch. It was brewed outside Illinois. Some of the liquor he purchased came from distilleries in other states or countries.

During the period of the indictment, defendant was a Chicago police officer and vice coordinator assigned to the district where the Scene was located.

In late November or early December, 1969, defendant and several other police officers visited the Scene. They sat at the bar and defendant asked King how it was going and whether King had any problems. King described how a police sergeant would come into the lounge on weekend nights and require payment of $10 or $20 in exchange for not enforcing a late night parking ordinance which went into effect one hour before closing. King also told defendant that police officers would come on week nights and unjustifiably accuse him of staying open after hours.

This conversation occurred at about 2:00 A.M. when the lounge was busy. Defendant asked if there was a more quiet place where they could talk. King led defendant to a back room. Once in the room, defendant said, "In order to avoid all this bullshit why don't you pay so much a month." King asked, "Now, what's the mutuels?" To which defendant replied, "Well you tell us." King offered $50.00 a month, a sum which defendant found acceptable. King and his wife made the payment to defendant.

King testified that he paid the money to defendant because he feared that if he did not pay it might jeopardize his liquor license and lead to more "harassment."

Just before Christmas, 1969, defendant and three other officers all in plain clothes entered the Scene Lounge. During conversation with King one of the officers mentioned that a gift had been given or would be given to the "Commander." One of the officers asked what King was going to give. King displayed a bottle of Grand Metaxa. Then one of the officers asked, "Well what about us?" King replied, "O.K. Stop around Christmas and I will have something for you."

King testified that he inferred from this conversation that if he didn't cooperate he might be charged with liquor violations or risk loss of his license.

Later during the Christmas week, defendant stopped at the Scene between 7:00 and 8:00 P.M. before it had opened for business. He had previously called to make sure someone would be there. King had two cases of liquor and two

1. In pertinent part, § 1951 provides:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

(1) . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."

extra bottles waiting for him when he arrived, and assisted in loading the cases into defendant's car. King estimated the value to be over $300.00.

Sometime between Christmas, 1969 and New Year's Day, King had another conversation with defendant at the police station. King complained to defendant that even though he was paying $50.00 a month, he had been forced to pay $300.00 to a sergeant and a patrolman the previous evening. Defendant professed ignorance of the incident and suggested that they go see the "boss." Defendant and King then went to the district commander's office. Defendant went in to see the commander and, after a few minutes, King was invited into his office.

In the presence of defendant, King related to the commander the incident of the previous night. King then asked, "Why am I paying $50.00 a month when I am brought into the station for after hours and forced to pay $300.00 a month?" The commander replied, "I will take care of this. Don't worry about it."

In January, 1970, defendant again visited King at the Scene in the company of other police officers. Defendant asked to see King for a few minutes. The two then went to a back room. King called his wife; Mrs. King came in and gave defendant $50.00.

Following the payments, the Scene had no further parking problems.

### 1. *Claim That Challenges For Cause Were Improperly Overruled.*

Shortly before defendant's trial began, another vice officer from defendant's district was tried and convicted of extortion of a tavern owner in violation of § 1951 before another judge of the district court. In other respects the two cases were unrelated.

During the selection of the jury for this case, seven, ultimately, of those called had served on the earlier jury. One indicated that his judgment might be af-

fected by such service and was excused for cause. Each of the other six testified he could be impartial, and defendant's challenges of them for cause were overruled. Defendant exhausted his peremptory challenges, using five for other jurors, but one of the jurors from the other case remained on the jury.

Mere service on another jury confronted with similar charges and similar facts is not, even where some of government witnesses are the same, the type of experience from which the law will infer bias.[2] We find no error.

### 2. *Alleged Failure to Prove Extortion.*

Under § 1951 extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened fear, or under color of official right." The government's proof was directed to showing that King feared economic loss should he not comply with defendant's demands.

Defendant contends that the government's proof was an insufficient basis upon which to convict for extortion. Because King admitted his encounters with the defendant were friendly and defendant never said nor intimated he would cause "trouble," defendant contends that King's conduct was not motivated by fear as required by § 1951. Rather, defendant argues, King willingly gave money to defendant because it brought certain advantages (such as non-enforcement of parking restrictions) to which he was not lawfully entitled. Thus, in essence, defendant argues that he was merely a receiver of bribes and could therefore not be guilty of extortion.

Fear, as used in § 1951, includes not only fear of physical violence but fear of economic harm, as well. Bianchi v. United States, 219 F.2d 182, 189 (8th Cir., 1955), cert. denied, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249; United States v. Sopher, 362 F.2d 523, 527 (7th Cir., 1966), cert. denied, 385 U.S. 928,

---

**2.** United States v. Haynes, 398 F.2d 980, 984 (2nd Cir., 1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 124; United States

v. Cooper, 332 F.2d 790 (3rd Cir., 1964); United States v. Estrada, 441 F.2d 873, 879 (9th Cir., 1971).

87 S.Ct. 286, 17 L.Ed.2d 210. It is not necessary that this fear be a consequence of a direct threat, it is enough that the circumstances surrounding the alleged extortion render the victim's fear reasonable. See e. g., United States v. Tolub, 309 F.2d 286, 288–289 (2nd Cir., 1962); United States v. Addonizio, 451 F.2d 49, 73 (3rd Cir., 1972), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812; Carbo v. United States, 314 F.2d 718, 740 (9th Cir., 1963); Callanan v. United States, 223 F.2d 171, 175–176 (8th Cir., 1955); United States v. Glasser, 443 F.2d 994, 1006 (2nd Cir., 1971), cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95.

Indeed, fear may be present even if confrontations between the victim and the alleged extorter appear friendly:

"The fact that relations between the victims and the extorters were often cordial is not inconsistent with extortion. Knowing that they were at the mercy of the Attorney General's office, it is a fair inference that the victims felt that to save their businesses they had to keep the extorters satisfied." United States v. Hyde, 448 F.2d 815, 834, 5th Cir., 1971), cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745.

Finally, it is important to note that the economic loss which the victim fears may be a consequence of action which the alleged extorter has a duty to take:

"It is the wrongful use of an otherwise valid power that converts dutiful action into extortion. If the purpose and effect are to intimidate others, forcing them to pay, the action constitutes extortion. Put another way, it is the right to impartial determination of the issue on the merits (i. e. whether to enforce the law or whether to picket or strike) that the victim is deprived of when these actions are taken for the purpose of coercing him into paying. The distinction from bribery is therefore the initiative and purpose on the part of the official and the fear and lack of voluntariness on the part of the victim." United States v. Hyde, *supra,* at 833.

While portions of King's testimony taken with other evidence may be consistent with defendant's view that King freely gave money and liquor to obtain advantages, the jury could reasonably infer from all the circumstances, including defendant's official position, that King was in fear of harm to his business, his fear was reasonable, and defendant exploited it to extort money and liquor.

If early morning customers of the Scene had their cars ticketed, they might take their business elsewhere or at least leave earlier. An arrest for staying open after hours could lead to loss of the liquor license. Defendant, the vice coordinator of the district, promised to eliminate these concerns in exchange for a monthly payment. There was support for a finding that King believed that implicit in defendant's offer was the threat of continued "parking problems" and other harassment if the money (and later liquor) was not forthcoming.

In arguing for acquittal, defendant's counsel presented his view of the facts, i. e. that King was a willing participant and that any fear which King felt was unreasonable. The jury was instructed that in order for defendant's conduct to be considered extortion defendant must obtain the money through a wrongful use of fear, including fear of economic harm, and that the fear must be reasonable. Thus the issue of whether King gave money to defendant voluntarily in order to obtain certain advantages or out of fear that if money was not forthcoming he would be subject to police harassment was squarely presented to the jury.

The jury apparently thought King's conduct was induced by fear and that defendant's conduct constituted extortion. We cannot say the verdict was not supported by substantial evidence.[3]

3. Because we cannot accept defendant's view of the facts, it is not necessary for us to reach the question of whether bribery and extortion are mutually exclusive. Neverthe-

### 3. Alleged Failure to Affect Interstate Commerce.

Extortion is an offense against the United States when the extorter "in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce, . . . ." 18 U.S.C. § 1951(a). In order to satisfy the interstate commerce element, the government offered proof that some of the beer and liquor purchased for the Scene had out of state origins, that in one instance a national corporation shipped its product across state lines to a Chicago warehouse from which it was delivered to the Scene and that in another instance a local company purchased liquor from out of state producers and then resold it to the Scene and others.

Relying primarily on cases applying the Fair Labor Standards Act, defendant argues that by the time the Scene acquired these beverages they were no longer in interstate commerce and that any extortion therefore could have no effect on interstate commerce. Because of differences in the statutes, such decisions are not controlling as to the requisite manner or degree of interference with commerce that may justify conviction under the Hobbs Act. United States v. Kramer, 355 F.2d 891, 896 (7th Cir., 1966), vacated in part on other grounds, 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed.2d 396.

Although King's business was primarily local, depletion of King's assets by the goods and money extorted, or the cessation of his business if he did not yield and his fears were realized, would tend to reduce the demand for and amount of beer and liquor moving into Illinois. The effect on interstate commerce would exist, though small by most standards, and only indirectly caused by defendant's acts. There are obvious questions as to the most desirable division between the states and the federal government of the function of enforcing good order, but given the existence of an impact of defendant's conduct on interstate commerce, the question is whether the Hobbs Act must be construed as stopping some margin short of full application of the commerce power.

"The commerce clause endows Congress will full and plenary power to do anything and everything necessary to protect interstate commerce—The specific question is whether in the statute involved the Congress has seen fit to exercise all of its power." Walling v. Goldblatt Bros., 128 F.2d 778, 781 (7th Cir., 1942).

When a law purports to regulate activities "in commerce" something less than the full commerce power is exercised. Walling v. Goldblatt, *supra*. On the other hand, a law which regulates matters "affecting" interstate commerce is within, though a more nearly full application of, the commerce power.[4]

■ Section 1951 clearly contemplates a full application of the commerce power. It proscribes extortion which "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce . . . ." In United States v. Stirone, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252, 255 (1960), the Supreme Court said of the Hobbs Act:

" 'That Act speaks in broad language, manifesting a purpose to use all the

---

less, we note that at least one circuit has held that they are not. See, United States v. Kahn, 472 F.2d 272, 278 (2nd Cir., 1973), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958.

4. See Perez v. United States, 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). As noted there, where an indirect effect on interstate commerce or its regulation is shown, federal power can include regulation of the price of intrastate milk, United States v. Wrightwood Dairy Co., 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942); the production of wheat grown wholly for home consumption, Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), and policies of hotels and restaurants, Atlanta Motel v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) and Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).

constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.' The Act outlaws such interference 'in any way or degree.' "[5]

Because Congress has seen fit to exercise its full power under the commerce clause, extortionate conduct having an arguably *de minimis* effect on commerce may nevertheless be punished. Battaglia v. United States, 383 F.2d 303, 305 (9th Cir., 1967), cert. denied, 390 U.S. 907, 88 S.Ct. 817, 19 L.Ed.2d 874 (extortion resulted in a pool table from an out of state source being kept from use); United States v. Augello, 451 F.2d 1167 (2nd Cir., 1971), cert. denied, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (assets of drive-in restaurant which purchased mostly from an out-of-state concern depleted by $100; proprietor, in addition, gave $200 from his personal funds.). See also United States v. Glasser, 443 F.2d 994 (2d Cir., 1971), cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95; United States v. Tropiano, 418 F.2d 1069, 1076 (2d Cir., 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530; United States v. Mitchell, 463 F.2d 187 (8th Cir., 1972).

▮▮ Where the victim of extortion, as here, customarily obtains inventory which has come from outside the state, obstruction and delay of, and effect upon commerce may, for the purpose of the Hobbs Act, be found in curtailment of the victim's potential as a buyer of such goods. This may be traced either through the depletion of his assets by his fulfillment of the extortionate demands or the harm which would follow if the threats were carried out. See United States v. Pranno, 385 F.2d 387 (7th Cir., 1967), cert. denied, 390 U.S. 944,

972, 88 S.Ct. 1028, 19 L.Ed.2d 1132; United States v. Battaglia, 394 F.2d 304, 312 (7th Cir., 1968), vacated on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297; United States v. Amabile, 395 F.2d 47, 49–50 (7th Cir., 1968).

### 4. *Allegedly Prejudicial Reference.*

When King described his first conversation with defendant, he testified that when defendant suggested paying money each month, he asked defendant "Now, what's the mutuels." The prosecutor asked why King used the word "mutuels," and King said he had given money to policemen before and that was the term always used. On objection, the court instructed the jury to disregard the answer. The prosecutor asked the question again and King said he had "heard the word before in connection with police officers." The court permitted this answer to stand.

▮ The conversation already described by King had included King's assertion that he had made frequent payments to a police officer concerning late night parking. We gather from colloquy out of the presence of the jury that he had made payments to other officers in the past. These were irrelevant, but the meaning of the word "mutuels" was not. It is dubious that significant prejudice to defendant arose, there was need for explanation of the word, and the district court did not abuse its discretion in handling the matter.

The judgment is affirmed.

SWYGERT, Chief Judge (concurring).

Several years ago I took issue by dissent with a holding of this court that a

---

5. We have considered the Supreme Court's 1971 interpretation of the Travel Act as a less than full application of the commerce power, and the policy factors the Court suggests Congress may have considered, Rewis v. United States, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). The two statutes are differently structured. We do not conclude that we are authorized, in a Hobbs Act case to create a formula under which an impact on interstate commerce is to be dismissed as *de minimis*.

depletion of corporate reserves comprised an "interference with interstate commerce" within the meaning of the Hobbs Act where a corporation was engaged in interstate commerce. United States v. Amabile, 395 F.2d 47, 54 (7th Cir., 1968), cert. denied, 401 U.S. 924, 91 S.Ct. 869, 27 L.Ed.2d 828. My concern was centered on the unlimited reach of the doctrine espoused by the majority:

> If a depletion of reserves is all that is necessary to show the requisite affect on commerce, then a threat of any kind to extract money made to a person who happens to operate a business engaged to any extent in interstate commerce comes within the statute's proscription. Under this rationale, a retail store owner, for example would be afforded federal protection from extortion, regardless of the nature or the likely affect of the threat simply because his stock of merchandise had in some measure moved in interstate commerce. 395 F.2d at 55.

Exactly what I apprehended in 1968 has today come to pass. My misgivings, however, did not persuade my brethren in *Amabile,* and I stand by the decision reached in this case as the law of the circuit.

I would also narrow what some might read to be the holding of the majority on the question of extortion under the Hobbs Act. DeMet was prosecuted below for a violation of that portion of the Hobbs Act which makes illegal "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened fear." As my colleagues recognize, the proof of the Government was directed to demonstrating a fear of economic loss on the part of King. Proof of fear may not have been necessary had the Government chosen to rely on another provision to the Hobbs Act, namely, that prohibiting "the obtaining

of property from another, with his consent, . . . *under color of official right."* (emphasis supplied). It is, of course, hardly appropriate to render a decision on that issue in this case, and I express no views on it.[*]

---

[*] It is worthy of note, however, that an argument has been made in the literature that this provision renders criminal any reception of money (not rightfully due) "under color of official right" by a police officer or other public official, without reference to whether the facts which surround the receipt characterize the action as bribery or extortion. *See* Stern, Prosecutions of Local Political Corruption Under the Hobbs Act: The Unnecessary Distinction Between Bribery and Extortion. 3 Seton Hall L.Rev. 1 (1971).