577 F.2d 495
 UNITED STATES of America, Plaintiff-Appellee,
v.
Morris PHILLIPS and James Beasley, Defendants-Appellants.
 Nos. 77-1283, 77-1428.
 United States Court of Appeals,
Ninth Circuit.
 May 11, 1978.
Rehearing Denied June 8, 1978.
 
 Jerrold M. Ladar, of San Francisco, Cal., for defendants-appellants.
 Edmund D. Lyons, Sp. Atty., Dept. of Justice, San Francisco, Cal., for plaintiff-appellee.
 Appeal from the United States District Court, Northern District of California.
 Before CARTER and TRASK, Circuit Judges, and BURNS,* District Judge.
 JAMES M. CARTER, Circuit Judge:
 
 
 1
 This is a joint appeal by Morris Phillips and James Beasley, who were convicted of conspiracy to commit extortion, in violation of the Hobbs Act (18 U.S.C. § 1951) (Count I), and of attempting to commit extortion, also in violation of the Hobbs Act (Count II). Phillips was sentenced to concurrent three-year terms and fined $10,000.00. Beasley was sentenced to concurrent five-year terms.
 
 ISSUES
 
 2
 Appellants raise on appeal the following issues:
 
 
 3
 (1) Both appellants question whether their conduct falls within the ambit of the Hobbs Act;
 
 Phillips contends:
 
 4
 (2) That the indictment improperly alleged the same offense in each count;
 
 
 5
 (3) That the district court abused its discretion in not requiring the tapes to be played in full;
 
 
 6
 (4) That the transcripts of the tapes were inaccurate and were not admissible;
 
 
 7
 (5) That the district court erred in permitting the introduction of a co-conspirator's statements before proof of Phillips' participation in the conspiracy;(6) That there was a fatal variance between his indictment and the proof adduced at trial;
 
 Beasley contends:
 
 8
 (7) That the district court erred in failing to order production under the Jencks Act of certain tax returns;
 
 
 9
 (8) Both appellants contend that the jury instructions were improper.
 
 FACTS
 
 10
 In 1970, Chester Smith, owner of Chet Smith Trucking, subcontracted with a private contractor, CEME Development Corporation, to perform various earthmoving services in the San Francisco Hunter's Point area. CEME was principal contractor for the San Francisco Redevelopment Agency ("RDA"), a governmental body responsible for urban redevelopment in the City and County of San Francisco. Smith completed his work in 1972 but could not obtain payment in full from CEME. Attempts to obtain payment were unsuccessful and in February 1973, Smith filed a claim with the RDA for $434,000.00, the amount owed to him. The claim stagnated and in October 1973, Smith filed suit against the RDA and CEME for $1.1 million in damages.
 
 
 11
 The events which followed unfold the extortion conspiracy.[1] Smith had several meetings with Beasley, who served as Chairman of the Citizens Committee of the Model Cities Program and was known as an influential member of the Hunter's Point community. Smith also met with Phillips, who, as Area Director of the RDA for Hunter's Point, was responsible for the operation of the project. Phillips had direct access to and influence with the five-person RDA Board, the approval of which was required for payment of Smith's claim. These meetings and communications will be summarized in chronological order for clarity.
 
 August 5, 1975
 
 12
 Smith met with Phillips at a San Francisco restaurant. Smith sought to influence Phillips to urge a quick settlement of his claim. Phillips told Smith he thought it was "criminal" that the RDA had refused to settle the claim. Smith informed Phillips that an RDA Board member, Joe Mosley, had attempted to solicit a $30,000.00 kickback from Smith in return for settlement of his claim. Phillips said that was a matter between Mosley and Smith.
 
 October 1975
 
 13
 Another meeting took place between Smith and Phillips in which Phillips described a meeting he had with another RDA Board member, Jim Silva. Phillips assured Smith "he could handle it" and promised to talk to Silva again.
 
 January 1976
 
 14
 Smith met with Phillips for lunch at a San Francisco restaurant. This meeting (and most subsequent meetings) was taped by Smith with a miniature body recorder furnished to him by the FBI. These tapes were admitted into evidence. During the meeting, Phillips told Smith that his claim would probably be settled soon and again showed his disinterest in the alleged kickback attempt of Mosley.
 
 January 26, 1976
 
 15
 Beasley came unannounced to Smith's place of business in San Francisco. Beasley said he had been sent by others to see how much it would be worth to Smith to have his claim settled. Smith said it would be worth a great deal, and Beasley said he would be in touch.
 
 March 17, 1976
 
 16
 Beasley again came to Smith's offices. In a taped conversation, Beasley told Smith he was acting on behalf of Mosley, Silva, and Phillips as go-between explaining that because of his criminal record he could not be embarrassed by disclosure. He said settlement would cost $67,000.00, but encouraged a counter-offer from Smith.
 
 April 19, 1976
 
 17
 During a taped conversation at Smith's office, Beasley told Smith he was going to meet Phillips to discuss the deal. Smith offered $5,000.00 down and $30,000.00 upon payment of his claim, and Beasley said he would check with Phillips about whether this offer was acceptable.
 
 April 26, 1976
 
 18
 Beasley met Smith at his office and for some still unexplained reason, offered to put up the initial $5,000.00 expected from Smith as a downpayment. Smith agreed.
 
 April-June 1976
 
 19
 Smith met with Beasley several times. Beasley suggested asking CEME to pay the kickback, but Smith rejected the idea as unrealistic. Beasley instructed Smith to pay $395.00 to a third party. This amount was to be deducted from the ultimate payoff.
 
 June 21, 1976
 
 20
 Smith taped a telephone conversation with Phillips. Phillips stated that Smith's claim would be settled in the near future because three of the five RDA Board members were leaving office soon and "they don't have nothing to concern themselves about." Phillips alluded to the fact that Smith should just follow directions. He told Smith he preferred not to talk to him over the telephone but within a week he could give Smith "an omen" or "a message."
 
 June 29, 1976
 
 21
 Beasley called Smith and demanded on behalf of Phillips and Commissioners Mosley, Silva and Jensen $5,000.00 in addition to that which Beasley allegedly already had paid on Smith's behalf. Later that day Phillips called Smith (indicating he wished he were calling from a pay telephone when talking to Smith) and said he understood Smith's "dilemma" and that "you're getting valid information; just do what you can about (it) and at least know where its coming from. . . ." Phillips further explained that "We got to use whatever conduit we can, irrespective of what you might think about the quality of 'em . . . ."
 
 July 2, 1976
 
 22
 Beasley called Smith and again demanded the $5,000.00. He said he was serving as bagman because he had no direct connection with the RDA. He told Smith that it was worth paying the money in lieu of longer delay or possibly never receiving payment on his claim.
 
 July 7, 1976
 
 23
 Beasley visited Smith and repeated his demand for the money. Beasley called Phillips' office while with Smith and asked Phillips' secretary to ask Phillips to "reassure Mr. Smith for me please." Later Smith called Phillips, who told him:
 
 
 24
 (a) "The thing you're dealing with on the 13th or the 20th looks like the magic day . . . ."
 
 
 25
 (b) "Well, I'm pretty much aware of everything that's being said to you on this. . . . I understand exactly how that's going. It doesn't present me with any problem. . . ."
 
 
 26
 (c) "I just said nobody will leave you hanging out."
 
 
 27
 Phillips agreed to meet Smith for lunch the following day.
 
 July 8, 1976
 
 28
 Beasley called Smith in the morning and told him to tell Phillips at lunch where the payoff was to take place. Smith did not tell Beasley where he was meeting Phillips for lunch. Despite this fact, Beasley was at the restaurant when Smith arrived and said "the man" would arrive shortly. Beasley left Smith and took a seat at the bar.
 
 
 29
 Phillips arrived and assured Smith that he was "guaranteeing the whole thing." Beasley, Phillips said, was acting only as a "messenger and a conduit." Smith offered the $5,000.00 directly to Phillips, but Phillips insisted it be given to Beasley for safety's sake. After that, Phillips said, he was going to "spend a couple of bucks for the conduit and pass it on." Smith then suggested a location for the payoff and Phillips agreed.
 
 
 30
 Smith met Beasley at the appointed time and place that afternoon. (Smith had not told Beasley about the meeting.) Smith gave the $5,000.00 to Beasley, who was immediately arrested. Phillips was arrested shortly thereafter.
 
 
 31
 Appellants were indicted by a special federal grand jury on two counts of violating the Hobbs Act, 18 U.S.C. § 1951. The indictment charged the two with participation in a scheme to extort $40,000.00 from Smith "by fear of economic loss and under color of official right." Appellants were tried separately and found guilty on both counts.
 
 
 32
 (1) THE HOBBS ACT
 
 
 33
 The appellants' contention that their conduct is not within the scope of the Hobbs Act is without merit.
 
 
 34
 These cases were argued on August 8, 1977. At that time United States v. Culbert, 548 F.2d 1355 (9 Cir. 1977) had recently been decided, holding that " 'although an activity may be within the literal language of the Hobbs Act, it must constitute "racketeering" to be within the perimeters of the Act,' " p. 1357, quoting United States v. Yokley, 542 F.2d 300, 304 (6 Cir. 1976). Following argument the present cases were submitted for decision. In October 1977 the Supreme Court granted certiorari in Culbert and on November 2, 1977, the panel vacated the submission of the present cases until the Supreme Court decided Culbert, at which time the cases would be automatically resubmitted.
 
 
 35
 On March 28, 1978, the Supreme Court reversed in United States v. Culbert, --- U.S. ----, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978), concluding that ". . . Congress intended to make criminal all conduct within the reach of the statutory language." The Court declined "to limit the statute's scope by reference to an undefined category of conduct termed 'racketeering.' " p. ----, 98 S.Ct. p. 1117.
 
 
 36
 The indictment charged that Phillips and Beasley conspired "to commit extortion as . . . defined in Section 1951, Title 18, United States Code, which extortion would obstruct, delay and affect commerce . . . in that . . . defendants . . . did conspire to obtain the sum of Forty Thousand Dollars ($40,000) from Chester C. Smith with his consent, said consent to be induced by fear of economic loss and under color of official right, to wit . . . ." (Emphasis added). The pertinent parts of Section 1951 are set forth in the margin.[2]
 
 
 37
 Thus the indictment, by charging conspiracy to commit extortion, under fear of economic loss and/or color of official right, sets forth a classic case of violation of the Hobbs Act (18 U.S.C., § 1951) as shown by the adjudicated cases. United States v. Mazzei, 521 F.2d 639 (3 Cir. 1975), cert. denied, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975) (kickbacks to state senator from rental to state agencies); United States v. Irali, 503 F.2d 1295 (7 Cir. 1974), cert. denied, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975) ($150 payoff to secure tavern license); United States v. DeMet, 486 F.2d 816 (7 Cir. 1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974) (payoffs to police for not enforcing parking ordinances by owner of nightclub); United States v. Hyde, 448 F.2d 815 (5 Cir. 1971) (state attorney general and aides extorting moneys from insurance companies); United States v. Pranno, 385 F.2d 387 (7 Cir. 1967), cert. denied, 390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132 (1968) (city officials extracting kickbacks for building permits); United States v. Frumento, 405 F.Supp. 23 (E.D.Pa.1975) (payment to state official by cigarette dealer for not collecting state tax); and United States v. Addonizio, 313 F.Supp. 486 (D.N.J.1970), aff'd, 451 F.2d 49 (2 Cir. 1971), cert. denied, 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972) (kickbacks from contractors for city building project).
 
 
 38
 All of these cases are similar to the instant cases in that in each one a public official is engaged in extracting money from another person through the use of fear of economic loss and/or color of official right.
 
 
 39
 The requisite effect on interstate commerce is satisfied. Only a de minimis effect is necessary, United States v. Shackelford, 494 F.2d 67, 75 (9 Cir. 1974), cert. denied, 417 U.S. 934, 94 S.Ct. 2647, 41 L.Ed.2d 237 (1974), and the effect need be only probable or potential, not actual, United States v. Staszcuk, 517 F.2d 53 (7 Cir. 1975) (en banc), cert. denied,423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1974). Here appellants threatened the depletion of resources from a business engaged in interstate commerce. This has been consistently found an adequate jurisdictional basis. See, e. g., United States v. Merolla, 523 F.2d 51, 54 (2 Cir. 1975); United States v. DeMet, supra, 486 F.2d at 821.
 
 
 40
 (2) MULTIPLICITY OF INDICTMENT
 
 
 41
 Phillips argues that both counts of the indictment were based on the same acts. Count 1 alleged conspiracy; Count 2 charged attempted extortion. The law is settled that a violation of the Hobbs Act is a substantive offense, separable from a Hobbs Act conspiracy. United States v. Jacobs, 451 F.2d 530, 534-35, nn. 2 & 5 (5 Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972); Carbo v. United States, 314 F.2d 718, 733 n. 17 (9 Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). The indictment was proper.
 
 
 42
 (3) PLAYING OF TAPES
 
 
 43
 Phillips contends that the district court erred in refusing to require the tapes of conversations between Smith and appellants to be played in full. Phillips recognizes that invocation of this so-called rule of completeness is subject to the requirement that the proffered evidence be relevant. See United States v. McCorkle, 511 F.2d 482, 487 (7 Cir. 1975). The record shows Phillips argued the general relevance of the tapes without specifying portions or passages. Given this failure, the district court's ruling was within its discretion.
 
 
 44
 (4) USE OF TRANSCRIPTS
 
 
 45
 Thirteen tapes of conversations were introduced during trial. Transcripts were submitted to the jury during the playing of four of these 13 tapes. Phillips now complains that these transcripts were inaccurate and hence not admissible. Phillips does not cite a single example of this purported inaccuracy, and the district court repeatedly reviewed the transcripts and found them to be accurate. Moreover, the jury was instructed that the tapes were the real evidence and that the transcripts were merely aids to their understanding. Testimony also was received from the FBI agent who prepared the transcripts verifying their accuracy. The transcripts were properly used. See United States v. Turner, 528 F.2d 143, 167-68 (9 Cir. 1975), cert. denied, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1976).
 
 
 46
 (5) CO-CONSPIRATOR'S STATEMENTS
 
 
 47
 Phillips argues that there was not "substantial independent evidence" other than hearsay of a Phillips-Beasley conspiracy to support the introduction of statements from Beasley under the co-conspirator's hearsay exception. See United States v. Peterson, 549 F.2d 654, 658 (9 Cir. 1977); United States v. Calaway, 524 F.2d 609, 612 (9 Cir. 1975), cert. denied, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 733 (1976). In fact, Phillips' own words provide ample evidence both of the illegal conspiracy and his participation in it.
 
 
 48
 Smith's first contacts with anyone connected with the RDA were with Phillips. Shortly thereafter, Beasley came unannounced to offer Smith a deal. On June 21, Phillips told Smith to follow Beasley's directions and assured him of RDA Board approval. On July 8, Phillips met Smith at a restaurant and openly admitted his role in the plan, Beasley's role as a "messenger and a conduit," and his use of the payoff money. Moreover, Beasley knew both of the Phillips-Smith restaurant meeting and of the drop-off location facts revealed only to Phillips. This independent evidence proves the existence of a conspiracy and Phillips' connection with it.
 
 
 49
 Phillips also contends that the trial court committed reversible error by permitting Beasley's statements in evidence before the existence of the conspiracy had been proven. But the procedure of provisionally admitting a co-conspirator's statements is well established. United States v. Heck, 499 F.2d 778, 790 (9 Cir. 1974); United States v. Castanon, 453 F.2d 932, 934 (9 Cir. 1972). Phillips' contention that this practice is prejudicial therefore is unavailing.
 
 
 50
 (6) VARIANCE
 
 
 51
 The indictment charged Phillips and Beasley with threatening Smith that they would "impede and obstruct payment of Smith's claim . . . unless and until Smith consented to pay $40,000 to defendants." Phillips contends that the government's proof showed only that he and Beasley promised quick settlement in return for the payoff. Cf. Stirone v. United States, 361 U.S. 212, 216-17, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). He thus claims there was a fatal variance between the indictment and proof.
 
 
 52
 Beasley in fact told Smith on July 2 that paying the money was better than no settlement at all. Smith's claim had been pending with the RDA for over three years and there was no indication the RDA intended to settle. The very need to pay certain RDA Board members suggests their unwillingness to settle. It is true that Phillips never threatened nor apparently intended to actively obstruct the claim. But this was not necessary. His failure to support the claim amounted to effective killing of it. There is no requirement that there be active rather than passive conduct to constitute extortion. Cf. United States v. Hathaway, 534 F.2d 386 (1 Cir. 1976) (threat to not award contract); United States v. Braasch, 505 F.2d 139 (7 Cir. 1974) (promise of nonenforcement of local liquor ordinances).
 
 
 53
 The statute itself requires only that a defendant "affect" interstate commerce by his threats. Even if Phillips and Beasley did not " obstruct," it is certain they did "affect." In order for a variance to be fatal to an indictment, the substantial rights of a defendant must be prejudiced. Fed.R.Crim.P. 52(a); United States v. Anderson, 532 F.2d 1218, 1227 (9 Cir. 1976), cert. denied, 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976). Since appellants could have been convicted under this alternative working, no prejudice resulted and any variance occurring was harmless. Cf. United States v. Bolzer, 556 F.2d 948 (9 Cir. 1977); United States v. Andrino, 501 F.2d 1373, 1378 (9 Cir. 1974).(7) JENCKS ACT MATERIAL
 
 
 54
 Beasley claims that Smith's personal income tax returns constitute "statements" under the Jencks Act, 18 U.S.C., § 3500, and that the district court erred in refusing to order their production. Such evidence allegedly would have proven that Smith suffered no loss of his interstate buying power.
 
 
 55
 Beasley makes no showing that the information in the tax returns related to Smith's "cash flow" position. But it is clear that the tax returns would have indicated the extent of Smith's interstate business and thus related to the government's asserted jurisdictional basis. A contrary conclusion might violate the policy of liberally construing the Jencks Act. See Goldberg v. United States, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976).
 
 
 56
 There is some doubt whether Smith's tax returns constitute "statements." Cases under the Jencks Act generally concern prior testimony, written materials, or interviews relating to the alleged offenses. In the one case where a defendant sought to produce tax returns, the court did not answer the question of whether the returns were producible, but ruled that the information contained in the returns was obtained in cross-examination anyway. See United States v. Covello, 410 F.2d 536, 545-46 (2 Cir. 1969), cert. denied, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969).
 
 
 57
 The real answer to Beasley's complaint is that production of the tax returns would not have served any purpose. The fact that Smith used some capital for interstate purchases is undisputed, as is the fact that appellants would have taken a sizable amount from Smith. The tax returns would not have shown how this money would have been spent. At most this evidence would have been cumulative. Thus, Beasley suffered no prejudice from the alleged Jencks Act error. Cf. United States v. Carrasco, 537 F.2d 372, 377 (9 Cir. 1976); United States v. Phillips, 482 F.2d 1355, 1357 (9 Cir. 1973), cert. denied, 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 76 (1974).
 
 
 58
 (8) JURY INSTRUCTIONS
 
 
 59
 Both Phillips and Beasley argue that the district court erred in refusing to instruct the jury that if they were guilty of bribery, they could not be also guilty of extortion. However, appellants were indicted for extortion both by fear of economic loss and under color of official right. The circuits are unanimous in concluding that where official right is alleged, bribery and extortion are not mutually exclusive under the Hobbs Act. See United States v. Hathaway, supra, 534 F.2d at 394; United States v. Braasch, supra, 505 F.2d at 151; United States v. Kahn, 472 F.2d 272, 278 (2 Cir. 1973), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973).
 
 
 60
 The district court initially refused to give the government's requested instruction on coercion as a defense because Phillips' counsel objected to its being given. Later, however, it became apparent that the jury was considering coercion as a defense for Phillips. At this point, the district court gave a supplemental instruction on coercion. Phillips claims this was error.
 
 
 61
 Phillips testified that he was "forced" and "coerced" by Beasley a " forceful guy" who worked through a "methodology of fear" to make certain statements to Smith. In addition, Phillips' counsel argued coercion to the jury in his discussion of willfulness. Since "the necessity, extent, and character of additional instructions are matters within the sound discretion of the trial judge," United States v. Miller, 546 F.2d 320, 324 (9 Cir. 1976), the court could properly conclude that the evidence supported the instructions.
 
 
 62
 Phillips lastly argues that it was reversible error for the district court not to instruct the jury that conspiracy is a specific intent crime. The short answer to this is that the court did so instruct the jury. See TR., p. 1176 and E. Devitt and C. Blackmar, Federal Jury Practice and Instructions, § 29.05 (2d ed. 1970).
 
 
 63
 The judgments of conviction are AFFIRMED.
 
 
 
 *
 Honorable James M. Burns, United States District Judge, District of Oregon, sitting by designation
 
 
 [1]
 The government's chief witness was Smith, who traced his meetings and conversations with appellants. Most of his conversations were taped and introduced as evidence
 
 
 [2]
 18 U.S.C., § 1951
 Interference with commerce by threats or violence
 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 (b) As used in this section
 (1) The term "robbery" means . . .
 (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
 (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.
 (c) . . .